MARY ELIZA HYNES et al., Respondents, *v.* KATE McDERMOTT et al., Appellants.

The presumption of marriage from a cohabitation, apparently matrimonial, is one of the strongest known to the law, especially in cases involving legitimacy. Where there is enough to create a foundation for the presumption, it can be repelled only by the most cogent and satisfactory evidence.

As to whether the general rule of law that a marriage, valid or void by the *lex loci,* is valid or void everywhere, applies to the case of a domiciled citizen of this State, who, while temporarily sojourning in another country, contracts a marriage there, valid under our laws, but invalid by the law of the place, *quære.*

In an action of ejectment, wherein plaintiff M. claimed as the widow, and the other plaintiffs as children of H., a citizen of the United States, it appeared that H., who resided in the city of New York, while stopping at a hotel in London, in 1871, made the acquaintance of plaintiff M., an English subject and an employe in the hotel. A promise to marry, on his part, and an intention of marriage between them was proved ; also a mutual consent to be, and to live together, as husband and wife, and a subsequent cohabitation in that apparent relation. The evidence, however, established that the cohabitation did not commence with a marriage, valid by the English law, and there was no evidence of a subsequent marriage, in accordance with that law. In June, 1871, the parties went to Paris, where they lived together as husband and wife, and he introduced her to acquaintances as his wife. They returned to London, where they lived together until his death which occurred in 1874, and where the children, who are plaintiffs, were born. H. addressed M. as Mrs. H., and so addressed letters to her, and their life in England was the ordinary household life of persons lawfully married. *Held,* that while the evidence was insufficient to show, or to raise a presumption of a marriage, in accordance with the requirements of the English law, in the absence of proof as to the marriage-law of France it

might be assumed that the requisites to constitute a marriage in that country are the same as our own, and so that the mutual assent of the parties to assume the relation of husband and wife, followed by cohabitation, constitutes marriage; and that the evidence raised a presumption and authorized a finding that the parties interchanged matrimonial consents in France.

Defendants, to meet this presumption, gave evidence to the effect that after the return of the parties to England, M., in business transactions, used the name she bore before her acquaintance with H. M., as a witness, gave explanation as to the reason for using such name in certain of the transactions; as to others she denied such use. *Held*, that as the facts sworn to by defendant's witnesses were either contradicted or did not conclusively repel the presumption of marriage, this court was precluded from reviewing the question (Code of Civil Procedure, § 1337), and the finding of the jury was conclusive.

(Argued January 18, 1883; decided March 6, 1883.)

APPEAL from judgment of the General Term of the Court of Common Pleas, in and for the city and county of New York, entered upon an order made April 3, 1882, which affirmed a judgment in favor of plaintiffs, entered upon a verdict, and affirmed an order denying a motion for a new trial.

This was an action of ejectment to recover possession of certain lands in the city of New York.

The material facts are stated in the opinion.

*John Hallock Drake* for appellants. The validity of a marriage contract is to be determined by the laws of the country where it is made. The *lex loci contractus* determines the status of the parties. (Bishop on Marriage and Divorce, § 335; Story's Conflict of Law, §§ 79–81; *Dalrimple* v. *Dalrimple*, 2 Hagg. Con. 54; *Schrimshire* v. *Schrimshire*, id. 395; *Connelly* v. *Connelly*, 2 Eng. L. & Eq. 570; *Herbert* v. *Herbert*, 2 Hagg. Con. 271; *Stevenson* v. *Greely*, 17 B. Monr. [Ky.] 193; *Midway* v. *Needham*, 16 Mass. 157; *West Cambridge* v. *Lexington*, 18 id. 506; *Putnam* v. *Putnam*, 25 id. 433; *In Matter of Webb*, 1 Tuck. 373; *Van Voorhis* v. *Brintnall et al.*, 86 N. Y. 18; *Thorp* v. *Thorp*, N. Y. Ct. of App., Daily Reg., Jan. 8, 1883; *Davis* v. *Davis*, 1 Abb. N. C. 140.) It having been shown that the intercourse was, in its origin, illicit, the pre-

sumption is that it so continued, and the onus of proof is on the plaintiffs. (*Cunningham* v. *Cunningham*, 2 Dow. 482; *Lapsley* v. *Grierson*, 1 H. of L. Cas. [C. & F.] 498; *Rose* v. *Clark*, 8 Paige, 573; *Clayton* v. *Wardell*, 4 N. Y. 236; *Brinkley* v. *Brinkley*, 50 id. 198; *Badger* v. *Badger*, 88 id. 546.) Reputation of marriage to be effective must not be divided; it must be general, and consistent with matrimonial cohabition. (*Clayton* v. *Wardell*, 4 Comst. 230; *Cunningham* v. *Cunningham*, 2 Dow. 482; *Brinkley* v. *Brinkley*, 50 N. Y. 198; *Dysart Peerage Case*, 6 Eng. L. R., H. of L. 514; *Badger* v. *Badger*, 88 id. 548.) The court erred in charging that, if the jury is satisfied that in France there was cohabitation as husband and wife, acknowledgment and recognition of each other to friends and acquaintances and the public as such, they are at liberty to infer that these two people, being at liberty in France to contract a valid marriage, did so. (*Fenton* v. *Reed*, 4 Johns. 52; *Jackson* v. *Claw*, 18 id. 346; *Rose* v. *Clark*, 8 Paige, 574; *Wilkinson* v. *Payne*, 4 Term R. 468; *Stewart* v. *Robertson*, 2 Scotch and Divorce App. Cas. 532; *Lapsley* v. *Grierson*, 1 H. of L. Cas. [C. & F.] 498.)

*Joseph H. Choate* for respondents. Under section 1337 of the Code of Civil Procedure there can be no review in this court of the questions of fact depending upon conflicting evidence. (*In re Ross*, 87 N. Y. 514; *Davis* v. *Clack*, id. 623; *Marx* v. *McGlynn*, 88 id. 369.) The law presumes every thing in favor of the legitimacy of children, and it is a very powerful and overwhelming presumption. (*Fenton* v. *Reed*, 4 Johns. 52; *Breadalbane Case*, Eng. L. R. [Scotch and Appeal Cases] 182, 192; *Jackson* v. *Claw*, 18 Johns. Ch. 346; *Rose* v. *Clark*, 8 Paige, 574; *Starr* v. *Peck*, 1 Hill, 270; *In re Taylor*, 9 Paige, 611; *Durand* v. *Durand*, 2 Sweeney, 315; *Caujolle* v. *Ferrie*, 23 N. Y. 90; *Betsinger* v. *Chapman*, 88 id. 487; *Tyle* v. *Ellwood*, L. R., 19 Eq. Cas. 98; *De Thosen* v. *The Attorney-General*, L. R., 1 App. Cas. 686, 694; *Piers* v. *Piers*, 2 H. L. 31; 82 N. Y. 47; *Badger* v. *Badger*, 88 id. 554; *Cunningham* v. *Cunningham*, 2 Dow. P. C. 482;

*Clayton* v. *Wardwell*, 4 Comst. 227; *Chamberlain* v. *Chamberlain*, 71 N. Y. 423; *Dysart's Peerage Case*, L. R., 5 App. Cas.   ; *O'Gara* v. *Eisenlohr*, 38 N. Y. 296; *Wilkinson* v. *Payne*, 4 Term R. 468; *Rex* v. *Fourney*, 2 B. & Ald. 468.) The presumption in favor of legitimacy is so strong and absolute, that in order to defeat it, the party claiming illegitimacy must negative every reasonable possibility. (*Piers* v. *Piers*, 2 H. L. Cas. 331; *Caujolle* v. *Ferrie*, 23 N. Y. 109.) The marriage acts of Great Britain, declaring all marriages ·void unless solemnized in the places and according to the formal observances prescribed by those acts, do not apply to an American citizen whose domicile and residence is in New York, and who marries while temporarily sojourning in England, intending not to remain there, but to remove with his wife to America as his permanent home, and if in such a case the marriage is valid according to the law of New York, it must be sustained by our courts. (*Ruding* v. *Smith*, 2 Hagg. Const. 390; *Harford* v. *Morris*, id. 423, 486, note; *Middleton* v. *Janvrin*, id. 437; *Latour* v. *Teesdale*, 8 Taunt. 830; *Harfords* v. *Higgins*, 2 Hagg. Const. 432; *Harvie* v. *Farnie*, L. R., 5 P. D. 153; L. R., 6 P. D. 25, 46, 48, 51; U. S. Rev. Stat. 1993, 1994; *Killby* v. *Owen*, 7 Wall. 496; *Burton* v. *Burton*, 1 Keyes, 374; *Warender* v. *Same*, 9 Bligh, 103–4; Story's Confl. of Law, 846; Wheat. Confl. of Law, § 170; *Simonton* v. *Wallace*, 2 Swabey & Tr. 67; Friedburg, 127, 150; Die Herrschaft der Gesetze, etc., p. 79; Wharton's Law of Evid. 100, § 83; *Hutchins* v. *Kimmel*, 31 Mich. 133; Wharton on Confl. of Law, § 180; *Brower* v. *Brower*, 1 Abb. App. 214; *Losing* v. *Thorndyke*, 5 Allen [Mass.], 257; *Davis* v. *Davis*, 1 Abb. N. C. 140.)

ANDREWS, J.   The adult plaintiff, Mary Eliza Hynes, is the alleged widow of William Rose Hynes, who died in London, England, June 27, 1874.   The infant plaintiffs William Rose Hynes and Andrew Hynes, are the children of William Rose Hynes, Sr., by Mary Eliza Hynes, and were born in London, the one Dec. 18, 1871, and the other May 10, 1873.   The father

of the infant plaintiffs died intestate, seized of the premises in controversy, and the right of the plaintiffs to recover depends upon the question of the marriage of their mother with their father, William Rose Hynes. This issue was found by the jury in favor of the plaintiffs. There was no proof of a formal ceremonial marriage between the parties, and the sole question upon the merits is whether upon the whole facts appearing on the record, the jury were authorized to find that a marriage between the parents of the infant plaintiffs, was consummated prior to their birth.

William R. Hynes, the father, was a native born citizen of the United States, and prior to 1871, was a bachelor, residing in the city of New York. He had retired from active business. He possessed a quite large property in this country, mainly real estate. He was accustomed to make annual visits abroad, and in the spring of 1871, while stopping at the Langham Hotel, London, made the acquaintance of the adult plaintiff, a young woman employed in the hotel in the capacity of still-room maid, having charge of the linen, and the supervision of the female servants of the house. She was an English subject, the widow of Charles Saunders, who died in 1869, and had always resided in England. The plaintiffs, to establish the marriage between Mr. Hynes and Mrs. Saunders, proved an intention of marriage between the parties, and subsequent cohabitation in the apparent relation of man and wife, from about the 1st of June, 1871, to the death of Mr. Hynes, which occurred in June, 1874. It was shown that in the spring of 1871, at the Langham Hotel, Mrs. Saunders introduced Mr. Hynes to one of her brothers as the person she was about to marry. In June of that year, Mr. Hynes and the plaintiff Mrs. Hynes, were in Paris. A Mr. Fargo, of San Francisco, an acquaintance of Mr. Hynes, saw them together there at a hotel dinner table, and was introduced by Mr. Hynes, to the adult plaintiff, as Mrs. Hynes, and he afterward frequently saw them at their temporary residence in Place Madeleine. How long they remained in Paris, does not appear. They were in London at the birth of their eldest child, and were then residing in Glou-

cester street. In the spring of 1872, they removed to a house in Leverton street, where they remained until the spring of 1873, when they removed to a house known as Victoria Villa, in Kentishtown, where their second child was born, and where they continued to reside until Mr. Hynes' death. Mr. Fargo testified that he was a constant visitor of Mr. Hynes, both at the Place Madeleine and at Victoria Villa ; that Mr. Hynes was in the habit of addressing the adult plaintiff in his presence, as Mrs. Hynes, or Lizzie, and that he had frequently seen Mr. Hynes address letters to her as Mrs. Hynes. Their life in England, as detailed by the relatives of Mrs. Hynes, and other witnesses for the plaintiffs, was the ordinary household and family life of persons lawfully married, having children, the fruit of lawful wedlock. He treated Mrs. Hynes with apparent respect and affection, and was fond of his children. He spoke of Mrs. Hynes in the presence of others, as his wife. The relatives of his wife visited him on the footing of relatives by marriage. He introduced Mrs. Hynes' brother, as his brother-in-law. When he applied for a lease of Victoria Villa, he stated that he required a house for himself, his wife and family. In June, 1874, he was thrown from a carriage in which he was riding with Mrs. Hynes, and received the injury of which he died. On being taken into a public house, he asked if his wife was much hurt, and requested that his children should be sent for.

These circumstances, cohabitation, family life, declarations of the parties, repute of marriage, while they do not constitute marriage, evidence it, because they are the circumstances which usually attend and characterize that relation, and the cohabitation having commenced in England, the presumption is that the marriage was contracted in accordance with the forms and requirements of the English law. The defendants sought to overthrow the presumption of marriage in England, arising from habit and repute, by showing the circumstances under which the cohabitation commenced. It appears that Mrs. Saunders in May, 1871, had left the Langham Hotel, and was living in lodgings at 169 Cleveland street, London. It was proved that on the night of Derby day, in that month, Mr. Hynes visited her, and

desired to remain with her, and she refused to consent without marriage, and complained that he had not kept a promise of marriage. He said he did not believe in the marriage ceremony or the mumbling of priests. He thereupon, in the presence of witnesses, took a ring from his pocket and gave it it to her, saying that if she would wear the ring and be true to him, he would consider her his wife as much as if they had been married in church. She accepted the ring on these conditions, and he remained there that night, and from that time until his death, openly lived and cohabited with her. At the time of this occurrence, Mrs. Saunders was pregnant of the eldest child, William Rose, born in the following December. This evidence seems conclusively to establish the commencement of an illicit intercourse between Mr. Hynes and Mrs. Saunders, prior to May, 1871, and also that the cohabitation of the parties did not commence with a marriage valid by the English law. The British Marriage Act prescribes that marriages shall be publicly celebrated, and expressly annuls all marriages not solemnized in church, or under a license before a magistrate. Nor is there any evidence of a subsequent marriage in England in accordance with the local law. There seems to be no ground for such a presumption in view of the facts above stated, and of the further fact which was found, that by the British statute, all marriages in England are required to be registered and that no registry of a marriage between these parties could be found.

If the issue of marriage, depended upon evidence that there was a marriage, according to the forms of the English law, the plaintiffs could not recover. The presumption of such a marriage, raised in the first instance, by proof of habit and repute, was rebutted by the evidence on the part of the defendants. But it is claimed that what took place in Cleveland street constituted a valid marriage, according to the law of New York, and while it is admitted that by the general rule of law, a marriage valid or void by the *lex loci*, is valid or void everywhere, it is insisted that this rule does not apply to the case of a domiciled citizen of this State, who, while temporarily

sojourning in another country, contracts a marriage there, valid according to our law, although invalid by the law of the place, by reason of non-compliance with the forms of celebration prescribed by the local law, and especially that the law of the domicile will control as to legitimacy, and rights of property depending upon marriage. This question if necessary to be decided, would require careful consideration. If, in the absence of any statute regulating the subject, the exception to the general rule exists, as is claimed, where both the parties to the contract, at the time of the marriage, are domiciled citizens of this State, does it extend to a case where one of them was then a subject of, and domiciled in the country where the contract was made, and by the laws of which, the marriage was invalid.

But we deem it necessary to decide this question in this case. Mr. and Mrs. Hynes, as has been stated, were in Paris during the summer of 1871. There was no proof given of the marriage law of France, and it was held on the former appeal in this case (82 N. Y. 41; 37 Am. Rep. 538) that in the absence of proof to the contrary, it would be assumed that the requisites to constitute marriage are the same in another country as in our own, and it may be safely assumed as a fact, that in France, the mutual consent of parties to assume the relation of husband and wife, followed by cohabitation, constitutes marriage, since if it was otherwise, it could readily have been shown. The jury, in addition to their general verdict, made a special finding that the parties, while in France, entered into an agreement *in presenti* to take each other as man and wife, and thenceforward cohabited together as such in France and England. There is no direct evidence of the interchange of consents during their stay in Paris. There was evidence that they lived together there in the apparent relation of marriage, and assuming that what occurred between them in Cleveland street, did not constitute a valid marriage by the law of this State, for the reason that the law of England can only be resorted to, to determine the effect of that transaction, we are, nevertheless, of opinion that the jury were

authorized to find that in France the requisite consents were interchanged, and that the parties, then and there, became husband and wife.

The presumption of marriage, from a cohabitation, apparently matrimonial, is one of the strongest presumptions known to the law. This is especially true in a case involving legitimacy. The law presumes morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardy. Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence. In *Morris* v. *Davies* (5 Cl. & Fin. 163) Lord LYNDHURST, speaking of this presumption, says: "The presumption of law is not lightly to be repelled. It is not to be broken in upon, or shaken by a mere balance of probability. The evidence for the purpose of repelling it must be strong, distinct, satisfactory and conclusive." In *Piers* v. *Piers* (2 H. L. Cas. 331) Lord CAMPBELL said, that the presumption could be negatived only "by disproving every reasonable possibility," and Lord BROUGHAM, in the same case, approved the general doctrine stated by Lord LYNDHURST, in *Morris* v. *Davies*, and said that the presumption could be dispelled only by evidence which was "clear, distinct and satisfactory." The presumption has been acted upon in several cases in our own courts, and in some recent cases in England, which have a very direct bearing in support of the finding of the jury in this case. The earliest case in our courts is *Fenton* v. *Reed* (4 Johns. 51). In that case the question was whether the plaintiff was the widow of one Reed. In the year 1785, she was the lawful wife of John Guest. Sometime in that year Guest left the State for foreign parts, and continued absent until sometime in the year 1794, and it was reported and generally believed that he had died abroad. The plaintiff in 1792 married Reed. In that year, and subsequent to the marriage, Guest returned to this State, and continued to reside herein until June, 1800, when he died. He did not object to the connection between the plaintiff and Reed, and said he had no claim upon her, and never interfered to disturb

their relations. After the death of Guest the plaintiff continued to cohabit with Reed until his death in 1806, and sustained a good reputation in society; but no solemnization of marriage was proved to have taken place between the plaintiff and Reed subsequent to the death of Guest. Upon these facts the court below decided in favor of the plaintiff. The court on appeal affirmed the judgment, saying "there existed strong circumstances from which a marriage subsequent to the death of Guest might be presumed. The parties cohabited together as husband and wife, and under the reputation and understanding that they were such from 1800 to 1806, when Reed died, and the wife during that time sustained a good character in society. A jury would have been warranted under the circumstances of the case, to have inferred an actual marriage, and the court below had sufficient ground to draw that conclusion; and as they have drawn it, and their decision being a substitute for a verdict, we will not disturb it." It will be noticed that the parties to the marriage in *Fenton* v. *Reed* came together under a void contract of marriage, but supposing, as may be assumed, that the former husband was dead; but they continued their connection after the return of the first husband, and from that time until the death of Reed, their connection was known to be meretricious; but this fact was not considered sufficient to repel the presumption of a subsequent marriage. The same presumption was applied under circumstances very similar in *Rose* v. *Clark* (8 Paige, 574); and in *Caujolle* v. *Ferrie* (23 N.Y. 90), a marriage was presumed to sustain legitimacy, although it appeared that the connection of the parties commenced in an illicit intercourse. The *Breadalbane Case* (Eng. L. R., 1 Scotch and Divorce Appeals, 182), decided by the House of Lords, upon great consideration, is an authority of great weight in support of the finding of the jury in this case. The question in that case was one of legitimacy, depending upon the fact whether James Campbell, who in 1781, eloped with the wife of one Ludlow, and with whom Campbell cohabited until his death in 1806, was married to her after the

death of her first husband in 1784, and prior to the birth of their eldest son in 1788. A marriage was celebrated between them in Scotland in 1782, which was clearly bigamous. By the law of Scotland marriage may be contracted by the consent of the parties without any formal celebration or the presence of witnesses. There was no direct evidence of the interchange of consents between James Campbell and his alleged wife after the death of her first husband, but they were in Scotland after that time, and before the birth of their eldest son, and they lived together as man and wife, and were reputed to be married. It was urged that the intercourse between the parties having been illicit in its origin, and the cohabitation having continued after the death of the first husband, without any marked change in its character, there could be no presumption of marriage, and, also, that the matrimonial consent must be referred to the commencement of the cohabitation, which would be insufficient, as the first husband was then living. The court, however, decided that there was a presumption of marriage between the parties subsequent to the death of Ludlow, Lord WESTBURY saying: " You must infer the consent to have been given at the first moment when you find the parties able to enter into the contract." *De Thoren* v. *The Attorney-General* (L. R., 1 App. Cas. 686) is also a very strong case of the application of the presumption of marriage. It appeared that on the 1st of July, 1862, William Ellis Wall obtained a decree *nisi* dissolving his then marriage, but which did not become final until the expiration of the period allowed for an appeal, during which time he could not legally marry again. In ignorance of this temporary disability he went through a ceremony of marriage at Glasgow with Miss Sarah Ogg on the 16th of July, 1862, before the time for appealing from the decree had expired, both parties believing that there was no obstacle to their marriage. They lived together as husband and wife and had children of the union. There was no evidence of any interchange of consents between them after the marriage in 1862, and neither had any suspicion prior to the husband's death of the invalidity of that marriage. The court, however, held that the parties must be presumed to have

interchanged consents, as soon as the impediment to their marriage was removed. It will be observed that in the *Breadalbane Case* this presumption was indulged although the ceremonial marriage was known by the parties to be bigamous, and in *De Thoren's Case*, although the parties regarded themselves as lawfully married, and the invalidity of the marriage was never known to them during the husband's life.

The presumption that Mr. and Mrs. Hynes interchanged the matrimonial consents in France is, we think, supported by the cases referred to. This presumption, moreover, giving credence to the testimony for the plaintiffs, is not inconsistent with the probabilities. It is true that their first intercourse was illicit, but nevertheless it was, as may be inferred under a promise of marriage on the part of Mr. Hynes. The transaction in Cleveland street, if the apparent purpose was the real one, was intended by the parties as an assumption by them at that time of the relation of husband and wife. The subsequent conduct of Mr. Hynes is inconsistent with the supposition that it was a mere device on his part to obtain the temporary gratification of his passions. It is quite certain, in view of the situation of Mrs. Hynes, that she was anxious to have the marriage consummated. She was presumed to know that the transaction did not constitute a valid marriage by English law, and the same presumption applies to him, although in his case it was much less likely to represent the actual fact. But Mr. Hynes was not presumed to know that a marriage thus consummated would not be a valid marriage by the law of his domicile. Whether it was valid by that law is one of the questions elaborately argued before us in this case, and it is not settled by any statute or authoritative decision in our courts. The parties while in France might very naturally desire to remove any doubt as to the validity of their marriage, and this could be done by renewing there their consent to be husband and wife. That they did so is the inference of the law, and, as has been said, is not an unreasonable supposition from the circumstances.

The defendants sought to countervail this presumption, by

proof of acts and conduct, especially on the part of Mrs. Hynes after her return to England, inconsistent therewith and the evidence certainly raises grave doubts whether the parties ever consummated a marriage, or regarded themselves as man and wife. It was shown that in 1873, Mrs. Hynes opened an account at a bank in London in the name of Elizabeth Saunders, signing that name in books of the bank, which account was continued in that name until the death of Mr. Hynes, when she had it changed to the name of Mrs. Hynes.   In this account sums were credited, which appear to have been obtained on checks of Mr. Hynes, payable to "E. Saunders," and many checks were drawn by her against the account, in that name.   Mrs. Hynes attempted to explain the reason for the account being kept in this way, but the explanation seems quite unsatisfactory.   The defendants also produced a lease of the house in Leverton street, occupied by Mr. and Mrs. Hynes in 1872, dated February 9, 1872, to Elizabeth Saunders, as lessee, purporting to be signed by her in that name.   The lease was procured by a detective from the lessors in London, and he testified that the signature was in the same handwriting as the signature in the bank book. But Mrs. Hynes denied that it was her signature, and testified that she never saw the lease till the trial.   The defendants also produced and proved photographic copies from the official registry of births in London, in the district where the plaintiff Mrs. Hynes resided, and where the infant children were born, made as required by the English statute, within forty days after their births respectively, which correctly stated the date of their birth, their names, the place where Mrs. Hynes resided when the children were born, but which in one case gave the name of the father as " William Saunders," and the mother as " Mary Saunders, formerly Millis," and in the other case, the father's name as " William Saunders," and the mother's name as "Elizabeth Saunders, formerly Millis."   The name of the informant purports to be signed in the register.   In one case it is " Mary Saunders," and in the other " E. Saunders." The detective testified that these signatures were in the handwriting of Mrs. Hynes, but she testified that they were not her

signatures, and that she neither furnished any information to the register, nor had any knowledge prior to the trial, of the existence of these records. The jury accepted the explanation of Mrs. Hynes in respect to the bank account as satisfactory, and also her denial in respect to the lease and the register. We are not called upon to say whether the finding of the jury of a marriage, is satisfactory to us. There was a presumption of marriage raised by the testimony for the plaintiff. It was sought to be repelled by circumstances. These circumstances were either contradicted or did not conclusively repel the presumption, and this court is precluded by statute from review-ing a question of fact arising upon conflicting evidence in a case like this. (Code, § 1337.)

There are no exceptions which would justify a reversal of the judgment. The exception to the refusal of the court to charge that the validity of the arrangement shown to have taken place in England, must be determined solely by the law of England, is not available for two reasons; *first*, that the case was finally left in the charge on the presumption of a marriage, independent of the transaction in Cleveland street; and *second*, the special finding of the jury that the parties inter-changed consents in France, renders the point as to the effect of that transaction, immaterial. The other exceptions are con-sidered in the opinion of the General Term, and it is sufficient to say that we concur in the conclusion of the learned court in respect to them.

The judgment should be affirmed.

All concur.

Judgment affirmed.