(Lorain County, O., Common Pleas.)

N. L. JOHNSON v. STOWELL B. DUDLEY.

---

A marriage may be proved from acts of recognition, cohabitation, birth of children, and the like, and this even when the parties originally came together under a void contract, and also where the intercourse was at the commencement, illicit. And in case of conflicting presumptions on the subject of legitimacy, that in favor of innocence must prevail.

KOHLER, J.,

The petition in this case alleges that on or about the 10th of May, 1888, Lucius M. Warren, Virginia A. Conoway and Andrew J. Warren, children of Malachi Warren, deceased, and Maggie S. Bowler, Minnie C. Waldon and Thomas Waldon, grandchildren of said Malachi, were seized in fee simple of certain premises specifically described in the petition. That the said parties entered into a contract with the plaintiff, whereby it was agreed, in consideration that the plaintiff should prosecute, as their attorney, an action against the defendant Dudley, who was then in possession of the premises and refused to surrender the same, for recovery of possession of said lands, they would pay plaintiff the sum of $1,100; and that to secure the payment of said sum, the above named owners, on or about the date aforesaid, executed and delivered to the plaintiff their mortgage deed, and thereby conveyed to the plaintiff, his heirs, etc., the following premises, situated in the township of Russia, county of Lorain—describing two parcels of land, one piece consisting of about 166 acres, and the other piece consisting of 92 acres.

The contract referred to, provided that said Johnson should prosecute in the courts the claim of the said heirs of Malachi Warren, to recover said real estate from Dudley, and the sum of $1,100.00 was to be paid to the plaintiff in this case by said heirs, provided the claim to said land should be adjudged by the courts to constitute a good title thereto.

This mortgage was, in fact, made to secure the payment of this sum of $1,100, for the plaintiff's services in that behalf, and to secure the performance of the contract entered into by the heirs aforementioned, and $100 has been paid to the plaintiff upon this contract.

The mortgage was duly filed and recorded in the records of Lorain county and the 11th of October, 1889.

The plaintiff, thereupon, pursuant to this contract, commenced an action in the court of common pleas of Lorain County, against Mr. Dudley, some time in 1887 or 1888; and after some delay, the case was at last brought to trial before a jury, and a verdict was rendered in that cause in favor of Stowell B. Dudley. That judgment was subsequently reversed by the circuit court, for errors of the court below in its instructions to the jury, and the case thereupon proceeded to the Supreme Court of the state, where the judgment of the circuit court was affirmed.

It is alleged that there upon the defendant Dudley, pending said action, and without the knowledge of the plaintiff, purchased all the right, title and interest of the aforementioned heirs in and to the title to said real estate, and that the transfer of the title thereupon to said Dudley put an end to and caused a dismissal of the action for the recovery of said lands, and that the plain-

tiffs' said mortgage thereupon became absolute. He prays that an accounting may be taken of the amount due him, with interest from the date of said sale, and that judgment may be rendered, and that unless the sum so found due, with costs of suit, be paid at a short day, that the lands may be ordered sold, according to law to satisfy the same, with costs.

Issue is taken by the defendant Dudley, and in brief, he sets up that the mortgagors were not the legal heirs of Malachi Warren; that Malichi Warren and the mother of the said children were never married, and that consequently the mortgagors never derived any title whatever to any of the lands mentioned and described; and in short, the issue in this case turns upon the question of the legitimacy of these children, or rather their right to inherit title to these lands from their father Malachi Warren.

The case possesses a very interesting history, and perhaps a brief summary of the facts connected with the conclusions at which the court has arrived, may not wholly be out of order.

The main facts of the case have been before the courts before in various phases of litigaiton. A great many witnesses were called in the case who testified before this court, and the facts hereinafter stated, were fully brought out. The case was very ably and fully argued, both upon principle and authority, by counsel entirely familiar with the case from is earliest inception.

The following facts were in substance disclosed: For some time prior to 1837, Malachi Warren resided in the state of Alabama; he was a slave owner, and about that time, in the city of Richmond, Va., he purchased a young colored woman, then about sixteen or seventeen years of age, and took her with him to his home in Alabama; she was, however, it appears, more than his slave, for he lived with her in the state of Alabama, and several children were born there, the fruits of such cohabitation, viz., Mary Warren was born in 1837, James Warren was born in 1838, Alonzo Warren was born in 1844, Andrew Warren was born in 1846. Along about 1847, Malachi Warren removed from Alabama coming as far north as the city of Cincinnati, Ohio, and remaining there with his family a few months, went to the town of Madison. Ind., to reside, and while there Virginia Warren, a daughter, was born. He remained in Indiana some three or four years with his family, and then removed with them to Oberlin, Lorain county, and with the exception of a short time that he resided in Columbiana county, he resided at Oberlin until about the year 1861, about the time of the breaking o' t of the civil war, so that there was more than twenty years of constant cohabitation, and during which time six children were born; and during which time, the evidence shows that he cared for his family in all respects as a father, giving them the best education that he was capable of affording, providing for them not only the necessaries, but doing

more than that in the way of education, nurture and care. They lived together all these years, except in the winter season, when, on account of ill-health, Warren went to the south, to all appearances as husband and wife; he paid all the bills very liberally, bought his groceries at wholesale, and on his return from the south at the end of each winter's season, he was accustomed to settle up everything that had been incurred in the way of debts, and in this way so lived and treated his wife and children that it is but fair to say, I think, that no one would have ever thought of any other relation existing between him and Ellen, other than that of husand and wife, except the fact that he was a white man and that Ellen, the mother of these children, was colored.

He bought valuable tracts of land in Lorain county, I think three tracts in all, one piece of 130 odd acres, and another of 72. His evident purpose, his declared purpose in doing this, was to put his means into landed property to the end that his children surviving him might have the benefit of it, and in that shape they would be less likely to spend or squander it, than if the property was in some other condition.

About 1861, or just before the breaking out of the civil war, he and the woman Ellen, were prosecuted in the courts of Lorain county, on an indictment charging them with living together in a state of adultery. He was convicted and fined, which he paid. He was a southerner by birth, and it is evident that he sympathized with the southern cause in that great struggle, and that his sympathies were carried so far as to induce him to contribute substantial aid to the south; at all events, his opinions were so pronounced that he was more than suspected of it, and became so obnoxious to the patriotic people of the town of Oberlin that they threatened him with mob violence. They compelled him, as the evidence shows, to carry the American flag to the railway station. He took the train, about that time, to the south for his native state of Alabama, and there lived at an advanced age, about the year 1862. His family heard from him by letter once or twice after he returned to the south.

In May, 1861, and before his final departure for the state of Alabama, he made his will. which was a very carefully prepared instrument, prepared by Judge Burke.

He kept a record of the births of his children. It appears to be a leaf torn from a Bible; at all events it is testified to that it was in his hand-writing. showing the names and the dates of birth of his children, and also the name of Ellen Warren, born in the state of Virginia.

The will to which I have referred made very careful provision for his children and their mother. In brief, he gave to Ellen, commonly called Ellen Warren, and her children Alonzo, Andrew and Virginia, the entire rents. use and income of all his real estate. for their joint support, until Alonzo, commonly called Alonzo Warren, should ar-

rive at the age of twenty-one years, he was to have the sole and exclusive use, occupancy and control of the lands in question in Russia township, and being the lands in question in this case, for and during the term of his natural life; and after his death, the premises should vest in and become the estate in fee simple of the surviving child or chidren of Alonzo, and in case he left no legitimate child or children, then at his decease the said real estate should vest in and descend to the lawful heirs of Malachi Warren.

Alonzo Warren having a life interest in the land, leased the premises in writing to S. B. Dudley, about 1872, at which time Dudley took possession, and he has been in possession of the premises ever since up to this date. The lease ran until 1890, but Alonzo died in 1887, three years in fact before the expiration of the lease by its terms; Dudley paid the rental in advance up to 1890.

Ellen Warren died at the age of about 73 or 74, in Lorain county; Mary Warren died about 1870; James died a little later; Alonzo died in 1887; Andrew died along about 1896, and Ellen Warren died in 1894. And if I remember rightly, this would leave Virginia Conoway and Lucius M. Warren, surviving children of Malachi and Ellen Warren.

After the death of Alonzo, Dudley being in possession and refusing to surrender, Lucius M. Warren, Virginia A. Conoway and Andrew J. Warren, surviving children of Malachi Warren, entered into the contract already mentioned, with plaintiff, to prosecute the suit for the recovery of the real estate described, claiming the same as the legal heirs of Malachi Warren, deceased and gave the mortgage on their interest upon the land, to secure the performance of the contract upon their part; and Mr. Johnson, in performance of the contract on his part, commenced the suit in ejectment in the court of common pleas of Lorain county. And it appears that it was mutually agreed between the parties or their attorneys in that case, that the only question for the jury to determine was, whether Malachi and Ellen were husband and wife. If they were husband and wife, then the plaintiffs would be the legal heirs of Malachi, and the verdict should be for the plaintiffs; but if they were not husband and wife, then the plaintiffs, their children, would be bastards and not the legal heirs of Malachi, and the verdict should be for the defendant.

The testimony taken in that case, as shown by the record, was substantially the same as that brought out on the hearing in this court in the cause.

It appears also from the testimony, that sometime, perhaps about 1851, Malachi Warren, out of regard for his children, wrote and signed a deed or instrument called a deed of manumission.

As appears above, the trial in the court of common pleas, in the action of Lucius M. Warren and others against Dudley, resulted in a verdict for the defendant. The judgment in that case was reversed in the circuit court, and after proceeding to the Supreme Court, the cause came back to the common pleas court for a re-trial, and pending this, Dudley bought up the interest of the heirs, paying to Andrew, Lucius and Virginia Conoway $3,300.00, and they made their deeds of quit-claim to him, and it is also shown that he purchased the interest of certain legal heirs of Malachi Warren in the State of Virginia.

Now, the plain question for this court to determine is, at the time this mortgage was made to Mr. Johnson, were Andrew, Lucius and Virignia the legitimate heirs of Malachi Warren. If they were, then the mortgage which they gave to Mr. Johnson for his services, was a valid mortgage, and unless they pay the sum stipulated to be paid for his services, he has a right to look to the land described in it, for his compensation, to-wit: the sum of $1,000, with interest. If they were not such legal heirs, then Mr. Johnson, the plaintiff in this case, can take nothing by his mortgage, for the reason that they had no title to convey.

In the view of the court alone, it would seem on general principle, as between the Warren children and the plaintiff, that the plaintiff having faithfully kept his contract prosecuted this protracted litigation through all the courts, and as the result of that litigation clearly having secured for his clients the sum of $3,300, that he ought, in justice and equity, to receive the sum stipulated; for I think it is safe to say that but for his efforts and services in their behalf from court to court, that they never would have realized anything out of their claim.

But however equitable and right his claim may be, and however much he may deserve full satisfaction for his professional services, he must lose the value of what he has done and performed, unless it appears to the court that these heirs of Malachi Warren had a lawful claim or title to the lands in question, as the heirs of Malachi.

I take it that Mr. Johnson, the plaintiff in this suit, by virtue of his mortgage, stands upon whatever title these children had, as the heirs of Malachi, and I take it also, that the defendant, Mr. Dudley, having purchased the right, title and interest of Virginia, Andrew and Lucius, and thus terminated the action without the plaintiff's consent or knowledge, that it is, in all respects the same, so far as the condition of the mortgage is concerned, and if the case had been successfully prosecuted to judgment in their behalf, and so far as that is concerned, it may be considered that the mortgage by its terms has become absolute, and the right of the plaintiff to recover, be established, provided the title of the children holds good.

And this narrows the question right down to one proposition, as I view it: were these children bastards in the eye of the law of this State, or are they to be treated as the children of his marriage with Ellen, suc-

ceeding to whatever title he had in the lands as his lawful issue?

And this brings me to the testimony brought out as to the history of this family, the time of their living together in the state of Alabama, their removal to Indiana and thence to Ohio, the birth of the children and the facts and circumstances of the case.

The testimony of the mother is to the effect that when she was first purchased as a slave by the father of her children, and after she was taken to Lowndes county, Alabama, that Malachi and Ellen, by mutual agreement, took each of them mutually for husband and wife, and that a minister of the gospel solemnized the marriage. She testified to this in the former action. There is also the testimony of Virginia Conoway, the daughter, that she heard at that time or while they were still living in the South, I think that she heard her father say on one occasion to her mother that they didn't have to do it in that way referring to their marriage; that is to secure a license.

It is claimed by the defendant however that what she states in that respect was never testified to by her before, and that the statement originated with her and was first brought out on this hearing, and if that is true, it would weaken to some the effect of what she says.

It is also true that by the laws of the state of Alabama. such a marriage between a white man and a colored woman, could not be lawfully entered into, in short, it was prohibited under penality; and there was at one time a law in this state to the same effect, but that law has been repealed.

And this brings me to the question, were these parties, Malachi and Ellen, husband and wife, under the rules of the common law; in other words, while not a statutory or ceremonial marriage, may it be regarded and treated in all respects as a valid common law marriage?

Taking the whole conduct of Malachi Warren, at the time he first took this young woman, Ellen, at the age of sixteen years, to his home in Alabama, the birth of six children, his removal to Ohio, his long residence here, and the continued cohabitation, his ample provision for his entire family, his tender solicitude for the education and well being of his children, the acquisition of property. and the disposition of it by his will, taking the whole history of the case down to the time when he left the town of Oberlin. I cannot but conclude that his conduct was that of a kind father, and that he looked upon his children and treated them with the tenderness and affection that any father would treat his own children. During his absence, from time to time, from home, he wrote many letters to different members of the family, expressive of a tender parent's interest in their welfare. These letters abound in earnest suggestions as to their conduct and deportment, and can leave no doubt in the mind of any one reading them, that the object that was dearest to his heart all the time, was to see that his

children were well provided for, and their future happiness and prosperity secure.

His object in selecting the town of Oberlin as a place of residence is very apparent. Oberlin then, as now, was the seat of a great institution of learning, and the place was noted throughout the country as one where men and women were estimated at their true worth. rather than on account of their color or nationality; and having this woman, with wohm he had lived in the south where perhaps the cohabitation of a white man with a black woman passed without notice, and having brought these children into the world, he came to Oberlin as a place where he could liberally educate them, and where these children, the issue of a white man and a colored woman, would be less severely looked upon than elsewhere in all the north, and when he got to Oberlin he provided a home. took these children to school, rented a pew in the church. some times attended church with them, and the family lived, apparently to all the world. as husband and wife, the children growing up, attending school and church, until about the year 1861, when Malachi went south and never returned. He was then considerably advanced in years.

So far as I can see, up to that time, although there may have been more or less talk in the community, regarding his relations to the colored woman, with whom he was living. yet it passed by as was done in the case of a number of other families coming from the south that were supposed or believed not to have been married. But there was no objection of any kind, until down to the time when Malachi was indicted; and his indictment charging him with living in a state of adultery, may have some explanation, in fact. but he was probably known at that time as a southern sympathizer, and those who would recall that period will readily infer how obnoxious such a person would be in that community.

It is reasonable to infer that but for his troubles at about that time, he would have remained, lived and died at his home in Oberlin.

Now, we have the testimony of Mrs. Warren as to the ceremonial marriage by Mr. Robinson, in which, after telling them to stand up. he pronounced the words, "Miss Ellen Jackson and Mr. Warren, I now pronounce you man and wife,"followed up by these long years of cohabitation, the rearing of a family of children, the entry of their births in a register, and the provisions he made in his will for their support, and also the testimony of Virginia Conoway as to her father's declaration, indicating an actual marriage before the parties came to Ohio.

It is claimed on the other side that the statement of Ellen Warren as to this marriage, is not a fact worthy of belief, and what Virginia Conoway says about her father's declaration is discredited by the circumstances that it is a recent invention of hers, and was never heard of before.

It is claimed that the will made by Malachi Warren shows on its face that he intended his property to go to his legal heirs, and that it is manifest from all the circumstances, and eapecially the conduct of his son James, and the sentiments of his father toward him, that such could not have been and was not his intention, and that by the word "heirs" in the will, he meant others than the children of Ellen Warren. It is claimed, also, that the general reputation in the town of Oberlin was, that the relation of Malachi and Ellen was meretricious, and not that of a lawful marriage.

This is a very brief statement of what is claimed respectively by the plaintiff and defendant, and what the testimony discloses.

Upon the evidence disclosed, and under the law of this State, as I believe it to be, I cannot, as a matter of justice and equity, come to any other conclusion than that those children of Malachi Warren were born of lawful marriage, and that under the law, they were entitled to inherit this property, under the provisions of his will.    It seems to me it would be harsh and inequitable to do otherwise.

It is true that very many estimable people from Oberlin testified that the general reputation, regarding the family at Oberlin was that they were not married, but I think this is to be accounted for somewhat by the reason that it was a case of a white man living with a colored woman. Had Malachi Warren been living with a woman of the same blood as himself, under precisely the same circumstances, during all these years. I doubt whether anybody in the town of Oberlin would have ever questioned, from the fact of the relationship, his conduct and treatment of his family, anything other than a lawful union. The very fact therefore, of the difference between the husband and the wife as to color, would give occasion or remark, and by degrees, acquire the force of general reputation, and I do not attach the force and importance to a general reputation in that respect, that was given to it by Judge Green in his charge to the jury, in the case that was tried. In fact, the circuit court held that he erred in that respect.

On this point one witness testified that the talk was both ways, some claiming that they were married; others, that they were not.

But the weight of evidence on that point, I think, so far as reputation goes, went to show that the general estimate was not only in regard to Warren, but some other families there, that the marriage relation did not exist.

If Malachi Warren and Ellen had both been white. or on the contrary both been colored. and this same reputation had been established by proof, I should attach more importance to it. But I do not feel like taking the testimony as to reputation, and allow it to overcome the established facts as to the relationship and the origin of that relationship between Warren and his wife.

I think that in such a case the law should make every reasonable presumption in favor of legitimacy.

The cases that I have examined establish the rule that a marriage may be proved from acts of recognition, cohabitation, birth of children, and the like, and this, even when the parties originally came together under a void contract, and also where the intercourse was at the commencement illicit. And in case of conflicting presumptions on the subject of illegitimacy, that in favor of innocence must prevail.    See 9th Page's Chancery Report. 611, In re. Taylor, Vincent's case, 60th Pa. St. 239; Cargile v. Wood, 63 Missouri, 501. And also the very able decision of Judge Andrews, of the New York Court of Appeals, in the case of Hynes v. McDermott, 91 N. Y., 451, in which the authorities are fully collected. Justice Andrews says, in short, that the presumption of marriage from cohabitation apparently matrimonial, is one of the strongest known to the law, especially in cases involving legitimacy, where there is enough to create a foundation, for the presumption can be repelled only by the most cogent and satisfactory evidence.

And taking this case as a whole, the facts present a stronger case for the presumption of legitimacy than in the case referred to, where a common law marriage was held to exist between the parties.

And it seems to me that the decision of the Supreme Court of our State, in Wright v. Lohr. 13th Oiho St. 619, and Morris v. Williams, 39 Ohio St. 554, while the facts are by no means similar to the facts in this case. yet the decision of the court in those cases is in harmony with the view which I have expressed above.

The circuit court of this district, in a very recent decision, held a marriage valid by the rules of the common law, in a case where a man's liberty depended upon the decision. The defendant in the case had formerly lived with a woman, and cohabited with her apparently as husabnd and wife, for a period of years treated her as his wife, and under such circumstances as by the rules of the common law, to create that relation; he, however, disvegarded the obligations he was under to the woman, with whom he had lived as his wife, and contracted a legal marriage, and was prosecuted for bigamy, and in his defense the former marriage was attacked as illegal, but the court held it valid, and his conviction of a penitentiary offense was sustained.

There is another fact brought out in the testimony that I did not feel at liberty to disregard, and that was that after the Supreme Court had affirmed the decision of the circuit court, remanding the case back again for trial, that Dudley paid $3,300 to secure the title of these heirs.    It is said that he had a right to buy peace, and that it does not matter in this case; but Mr. Dudley was represented in the trial below by attorneys of great skill and ability, and it seems to me quite a considerable sum for

him to pay, merely for the purpose of buying peace. Under all the circumstances it looks very much as though the question of title was, to some extent at least, involved in the consideration; however, I do not place my finding upon that ground.

It is the judgment of the court that the plaintiff is entitled to an accounting for the amount due upon his contract, tow-it, the sum of $1,000, with interest as claimed; that unless that amount is paid to him within thirty days, the premises described in the mortgage be sold to satisfy the amount so found due, and costs of this action, and a decree may be drawn in accordance with this finding.