## Commonwealth v. Sipe

*Bernard E. DiJoseph,* for Commonwealth.
*Swartz, High, Flynn & Roberts,* for defendant.

KNIGHT, P. J., November 8, 1950.—Defendant was indicted for failure to support bastard children. After trial and conviction, he filed the above motions, which were argued before the court en banc.

In the early part of 1944 the husband of Sara M. Worthington was in the armed services of the United States. Sara then worked in a diner, where defendant also worked. In June 1944 there were several acts of intercourse between Sara and defendant. In July she missed her menstrual period, and defendant took her to a doctor, who informed her she was pregnant. On February 24, 1945, twins were born to Sara M. Worthington in a hospital. The physician who attended her during the delivery testified the births were premature by several weeks. Defendant paid a portion of the hospital bill, and in addition signed a written agreement in which he agreed to pay the lying-in expenses. From February 1945 to May of 1950 defendant paid Sara at least $25 per week for the support and maintenance of the children.

Defendant took the stand and practically corroborated Sara; in fact, he went further, for he indignantly denied Sara's testimony that he had missed about 50 payments, and insisted that he had only missed three or four. He did not deny that he was the father of the twins, and at the argument, his counsel frankly admitted that his client thought he was their father. The evidence, if properly admitted, was so overwhelmingly against defendant, that the jury took but five minutes to arrive at a verdict of guilty. This verdict should not be set aside if there is any legal way to sustain it.

It was encumbent upon the Commonwealth to overcome the presumption of legitimacy, and in order to do it evidence was offered to prove the nonaccess of

the husband during the time when the children were conceived. Under the law of Pennsylvania neither the husband nor wife could testify as to nonaccess. This ancient rule of evidence has been severely criticized by textbook writers, but it is still the law of our State. It would seem no less unjust to require an innocent husband to support children not his own than to stigmatize those children as illegitimate.

The Commonwealth sought to prove nonaccess by offering evidence to show that the husband of Sara Worthington was in the Army and overseas during the period in which the children were conceived. This evidence was admitted over objection, and its admission constitutes the grounds for the present motions.

First, the mother of Sara Worthington was called to the stand. She testified that Sara's husband, her son-in-law, was in the Army in February 1944, and that she gave him a farewell party that month in anticipation of his imminent departure for overseas service. The witness did not see her son-in-law again until the latter part of August 1944.

All this testimony we think was admissible. Certainly the statement that her son-in-law was in the armed services in the early part of 1944, and that she did not see him again until August of 1944 was competent. She was apparently friendly with Mr. Worthington, for she gave him a "farewell" party, and it might well be inferred, that she would have seen him between February 1944 and August 1944, if he had been available.

This witness was also shown a letter, and she identified the hand writing and signature as that of her son-in-law. This letter was dated July 10, 1944. It was on the stationery of the American Red Cross, and was mailed from Italy. This letter bears all the earmarks of a genuine epistle, and the ordinary layman would not doubt that it was written and sent by Mr.

Worthington from Italy in July 1944. The letter was admitted over objection, and its admission is assigned as error. The letter was not admitted to prove its contents, but to show that a letter written and signed by William Worthington, the husband of Sara, was mailed from Italy on July 10, 1944. For this purpose we are of the opinion that the letter was properly admitted. Mrs. Scott, the mother-in-law of William Worthington, testified that William was in the armed services, and that she gave a "farewell" party for him in February of 1944, and Sara Worthington testified that she did not go out with defendant until after she had heard that her husband had arrived overseas.

From this evidence and the obvious authenticity and regularity of the letter, the jury may well have found that it was William Worthington who mailed the letter in Italy on July 10, 1944.

The Commonwealth then offered in evidence the honorable discharge of William Worthington, after first proving his signature to the document, and otherwise identifying it as the discharge of William. This was objected to and admitted over objection. The discharge, which has been duly recorded in Bucks County, showed that William Worthington left the United States with his unit on February 27, 1944, and returned on August 4, 1944.

Mr. Wigmore, a universally recognized authority on the law of evidence, has this to say in reference to the admission into evidence of an honorable discharge (Wigmore on Evidence, 3rd ed., vol. 5, §1675 A) :

"A certificate of service in army, navy, or civil office, made pursuant to duty imposed by custom or statute is admissible, on principle. In the first place, it is virtually no more than a certified copy, in summary, of the regular record of service kept in the department; the record would be admissible on the principle of §1639, ante," (whenever there is a duty to record official doings, the record thus kept is admis-

sible) "and the certified copy on that of §1677, post. (The lawful custodian of a public record has, by implication of his office, and without express order, an authority to certify copies). "In the next place, it is made for the specific purpose of being exhibited and used; and to shut off its use in courts is to defeat its purpose in part. In the third place, to call for anything else in lieu of it is impracticable; for all the officers who shared in making the record cannot possibly be had as witnesses; and the chief of a Federal records-bureau is virtually inaccessible for 'viva voce' testimony; moreover, he personally knows nothing beyond the record. To exclude the certificate is practically to exclude all evidence on the subject.

"In view of the fact that the United States Army and Navy contained more than four million persons during the Great War, it is essential that the admissibility of service-certificates, under whatever name, should be recognized. A few statutes have expressly so provided. The Courts, however, have sometimes shown a narrow- common-law attitude which not only affronts common sense, but must cause deep resentment in the minds of all who know the value of the records of military service. The civilian legal mind here needs some liberalizing."

In Commonwealth v. Crowley, 26 Pa. Superior Ct. 125 (1904), defendant, convicted of murder, introduced evidence of the height and weight of his adversary for the purpose of showing disparity of physical strength. To rebut this evidence, the Commonwealth offered in evidence the certificate of discharge of the deceased from the United States Army, which showed the height of the deceased to be less than that shown by the evidence of defendant. The lower court admitted the discharge into the evidence, and the Superior Court held this to be error, and set aside the conviction.

The Federal courts, it seems, take a different view. In Armit v. Loveland et al., 115 F. (2d) 308 (1940), in a suit for damages by a sailor against his employers, to recover damages sustained through negligence, defendants offered evidence that part of plaintiff's condition was congenital. To rebut this, plaintiff offered in evidence his discharge from the Army in 1919, showing that at that time he was in good health. The district court admitted the evidence, and the circuit court held this to be no error.

Commonwealth v. Crowley was decided 46 years ago, and it may be that the Superior Court of today would take a more liberal view of this evidence. Then, too, we think the present case may be distinguished from that case. The personal characteristics of the soldier, such as his height, weight, color of his hair or eyes, are placed on the discharge, for purposes of identification, and have nothing to do with his service. If a question arose as to whether Worthington was in Europe during World War II, we think the discharge would be relevant; or, if the issue were, when he was inducted, or, when discharged, we think the certificate would be relevant. Likewise, we are of the opinion that on the question of when he left the United States, and when he returned, the discharge is relevant.

In Holobinko v. Holobinko, 70 D. & C. 539 (1950), Judge Wingert of Franklin County, for whose opinion we have high regard, said by way of dicta:

"Libellant's discharge is undoubtedly proper evidence of service in the United States Army and a discharge therefrom, but there is considerable doubt as to whether it is admissible in evidence to prove as facts the notations as to the character and place of service set forth in it. It was not shown that such notations were transcripts of a governmental record. Their source was not disclosed. They may well have been placed upon the discharge, on libellant's separation, from statements made by libellant himself."

It seems to us that the above reason for not admitting a discharge into evidence ignores the presumption of regularity and verity that applies to official records, and that a discharge is an official record is not open to doubt.

In Ex Parte Drainer, 65 F. Supp. 410, affirmed 158 F. (2d) 981, it is said:

"And once honorably discharged, such Honorable Discharge is a 'formal final judgment passed by the government upon the *entire military record*' of the person. United States vs. Kelly, 15 Wall. 34, 82 U. S. 34, 36." (Italics supplied.)

In the famous case of In re Findlay, 253 N. Y. 1, 170 N. E. 471 (1930), Justice Cardozo, one of the greatest judges our country has ever produced, had this to say as to the presumption of legitimacy:

"Potent, indeed, the presumption is, one of the strongest and most persuasive known to the law (Hynes v. McDermott, 91 N. Y. 451, 459; Matter of Matthews, 153 N. Y. 443), and yet subject to the sway of reason. Time was, the books tell us, when its rank was even higher. If a husband, not physically incapable, was within the four seas of England during the period of gestation, the court would not listen to evidence casting doubt on his paternity. The presumption in such circumstances was said to be conclusive (Cross v. Cross, 3 Paige, 139; Van Aernam v. Van Aernam, 1 Barb. Ch. 375; Thayer, Preliminary Treatise on the Law of Evidence, p. 540; 5 Wigmore, Evidence §2527; Nicolas on Adulterine Bastardy, pp. 29, 30). The rule of the four seas was exploded by the judgment in Pendrell v. Pendrell (2 Strange, 925), decided in 1732. It was exploded, as Grosse, J., observed in a later case (Rex v. Luffe, 8 East, 193, 208; Nicolas, supra, pp. 164, 172) 'on account of its absolute nonsense'. Since then the presumption of legitimacy, like other presumptions, such

as those of regularity and innocence, has been subject to be rebutted, though there have been varying statements of the cogency of the evidence sufficient to repel it. . . .

"Some of the books tell us that to overcome the presumption, the evidence of nonaccess must be 'clear and convincing' (Hynes v. McDermott, supra; Hargrave v. Hargrave, 9 Beav. 552; cf. Caujolle v. Ferrie, 23 N. Y. 90, 108, 139) ; others that it must lead to a conclusion that is 'strong and irresistible' (The Aylesford Peerage Case (L. R.), 11 App. Cas. 1, 17) ; others that it must be proof 'beyond all reasonable doubt' (Cross v. Cross, supra; Van Aernam v. Van Aernam, supra; Phillips v. Allen, 2 Allen, 453; Sullivan v. Kelly, 3 Allen, 148; Stegall v. Stegall, 2 Brock, 256; Fed. Cas. No. 13, 351 (Marshall, C. J.) ; 33 Harv. L. Rev. 307).

"What is meant by these pronouncements, however differently phrased, is this, and nothing more, that the presumption will not fail unless common sense and reason are outraged by a holding that it abides. If husband and wife are living together in conjugal relation, legitimacy will be presumed though the wife has harbored an adulterer (Hargrave v. Hargrave, supra; Bury v. Philpot, 2 Mylne & Keen 349). It may even be presumed though the spouses are living apart if there is a fair basis for the belief that at times they may have come together. Whether such a basis exists in any given instance is to be determined, however, in the light of experience and reason. The presumption does not consecrate as truth the extravagantly improbable, which may be one, for ends juridical, with the indubitably false (cf. Matter of Case, 214 N. Y. 199, 204)."

In the case of Com. v. Barone, 164 Pa. Superior Ct. 73 (1948), defendant was convicted of failure to support bastard children. There the husband of the mother

of the children must have lived in the vicinity, for he called at the home, where his wife was living with her paramour, for the purpose of seeing those of her children which were admittedly legitimate. In affirming the conviction, the Superior Court in the course of the opinion, said:

"Appellant contends that the Commonwealth's evidence did not exclude absolutely the possibility of access by the prosecutrix's husband during the period the children were conceived. This, of course, the Commonwealth was not required to do. Commonwealth's burden was to prove beyond reasonable doubt such facts as would justify the jury in concluding that the husband of the prosecutrix could not in the course of nature have been the father of the children. The negative proposition of nonaccess need not be absolutely proven. Legitimacy is not to be sustained 'by a sacrifice of probabilities in a futile quest for certainty'. Common sense and reason are not to be shattered in order to uphold the presumption of legitimacy."

Here the evidence was such as to convince any fair-minded person beyond a reasonable doubt that defendant was the father of the children; even without the honorable discharge, we believe there was enough evidence to convict.

Counsel for defendant makes the further point that in the course of nature, the husband, William Worthington, could have been the father of the children. This contention ignores the undisputed evidence. Prosecutrix testified that her last menstrual period was June 13, 1944, and that it was after that she first had intercourse with defendant. She missed her period in July and was taken to a physician by defendant, and pronounced pregnant. Conception must have taken place in June or early July 1944. At that time William Worthington was in Europe. True, it might have been possible for William to board a plane, come to

the United States, visit his wife, and then return to his outfit, but that a private in the Army would and could do this, is so extravagantly improbable, as to outrage common sense and reason.

In our opinion, defendant is obviously guilty, and he should not be relieved of his responsibility to these children by straining the presumption of legitimacy beyond the breaking point.

And now, November 8, 1950, the motions in arrest of judgment and for a new trial, are overruled, and defendant directed to appear in Courtroom B, on Friday, December 8, 1950, at 10 a. m., to receive the sentence of the court.