L.F. v M.A. (2024 NY Slip Op 50874(U))

[*1]

L.F. v M.A.

2024 NY Slip Op 50874(U)

Decided on July 9, 2024

Supreme Court, New York County

Hoffman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 9, 2024
Supreme Court, New York County

L.F., Plaintiff,

against
M.A., Defendant.

Index No. [redacted]

For Plaintiff: Bonnie E. Rabin, Esq., Deirdre L. Fletcher, Esq., Rabin Schumann and Partners LLP
For Defendant: Harriet N. Cohen, Esq., Ankit Kapoor, Esq., Cohen Stine Kapoor LLP

Douglas E. Hoffman, J.

The following e-filed documents, listed by NYSCEF document number (Motion 002) 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 133, 257, 258, 259, 260, 261, 262, 263, 264, 265, 266, 267, 268, 289, 290, 291, 292, 293, 294, 310, 341, 342, 343, 344, 345, 361, 362, 363, 364, 365, 366, 367, 368, 369, 370, 371, 372, 373, 374, 375, 376, 377, 378, 379, 388, 397, 398, 399, 400, 401, 407, 408, 409, 410, 411, 412, 413 were read on this motion to/for DISMISSAL.
[This is decision after trial, see also L.F. v. M.A., 78 Misc 3d 787 [Sup Ct, NY Cnty 2023] prior published decision compelling a Coptic Orthodox Church Bishop to testify at the trial whether or not he conducted a wedding ceremony for the two parties to this action].
After 20 days of trial, with the court hearing from competing expert witnesses, religious officials who participated in the same ceremony with differing views as to whether it was a marriage ceremony, the parties themselves, and numerous lay witnesses who observed the same event but allegedly took away diametrically opposed views as to whether it was a wedding ceremony, the court has to decide whether or not the parties were married in a religious ceremony on [redacted], 2017. At stake is not just the status of the parties' young child in common or spousal maintenance, but potentially millions of dollars in what would be marital [*2]assets versus separate property.
Plaintiff L.F. asserts that the parties were married in a religious ceremony on [redacted] 2017, at the [redacted] Coptic Orthodox Church in New York City. Defendant M.A., however, filed a motion to dismiss this matrimonial action (by motion sequence 002), alleging that the parties were never married, and that the ceremony on [redacted] 2017, the third ceremony at the church that day involving the parties, was only a family "blessing." Parties agree that the day started with their child's pre-planned baptism, and they also agree that after that, there was a second ceremony, Mother's baptism into the Coptic Orthodox church, which all agree was an unplanned ceremony. They also agree that there was a third, also unplanned, ceremony, although they disagree about the character of that third ceremony: it was either a wedding or a family "blessing." The parties also agree that they never obtained a New York State governmental marriage license and acknowledge that such a license is not required in New York if there was a valid religious marriage, see DRL §§ 12, 25. 
Although New York DRL § 13 requires that a marriage license be obtained prior to a marriage ceremony in New York, even where no marriage license is obtained, however, a marriage ceremony may still be valid if it was "solemnized between persons of full age" (DRL § 25). See also DRL § 12. New York recognizes as valid a religious marriage, even in the absence of a marriage certificate, where the "marriage [was] performed and solemnized in accordance with established religious ritual and practice." Ponorovskaya v Stecklow, 45 Misc 3d 597, 617 [Sup Ct, NY Cnty 2014] (collecting cases, finding no marriage to be valid in New York under the factual circumstances in that case, a ceremony in Mexico, listing the various concerns with such no-certificate marriages, including parties' unclear expectations and difficulties proving a marriage, adding in dicta a suggestion for the Legislature to consider repealing or amending DRL § 25). Currently, DRL § 25 remains the law, and this case is but one example of the conflicts raised by it: had the parties here been required to obtain a marriage license, whether before or after a religious ceremony, they may well have done so at the time, and there would have been no question but they were married (or not married, if they failed to obtain a marriage license if it were required). At this time, however, DRL § 25 would provide for recognition of a religious marriage here (if one took place, of course), even though the parties never obtained a marriage license.
The court's ability to hold such a certificate-less religious marriage as valid or invalid may not, however, depend on the parties' religious affiliation or the Court's interpretation of their religious observance. To hold otherwise would violate the First Amendment: "(t)he court has no authority to determine the validity of the alleged marriage under (religious) law; the dispute must be determined on the application of neutral principles of law and without reference to religious principles" Jackson K. v. Parisa G., 51 Misc 3d 1215(A) [Sup Ct, NY Cnty 2016] citing Storfer v Storfer, 131 AD3d 881 [1st Dept 2015] (emphasis added, other citation omitted). The First Amendment consists of two separate and overlapping protections: "Congress shall make no law respecting an establishment of religion" (i.e., the "Establishment Clause"), "or prohibiting the free exercise thereof" (i.e., the "Free Exercise Clause"). (US CONST AMEND I). The Establishment Clause prohibits the State from supporting or establishing any one religious group or practice, while the Free Exercise Clause guarantees the right to freely choose one's own course with regard to religious observance. Torcaso v. Watkins, 367 US 488, 492-93 [1961].
Marriage is "the relationship that is the foundation of the family in our society." Obergefell v. Hodges, 576 US 644, 666 [2015] (citing Loving v. Virginia, 388 US 1 [1967] and [*3]Zablocki v. Redhail, 434 US 374 [1978]). "The right to marry, establish a home and bring up children is a central part of the liberty protected by the Due Process Clause. Under the laws of the several States, some of marriage's protections for children and families are material. But marriage also confers more profound benefits. By giving recognition and legal structure to their parents' relationship, marriage allows children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives. Marriage also affords the permanency and stability important to children's best interests." Id. at 688 (citations omitted).
The corollary to this individual right of marriage is the importance to the states of recognizing and administering those rights and obligations of marriage (without, of course, infringing on the constitutional rights of individuals to marry), as discussed by the United States Supreme Court in the 2013 Windsor decision:
recognition of civil marriages is central to state domestic relations law applicable to itsresidents and citizens. See Williams v. North Carolina, 317 U.S. 287, 298, 63 S.Ct. 207,87 L.Ed. 279 (1942) ("Each state as a sovereign has a rightful and legitimate concern inthe marital status of persons domiciled within its borders"). The definition of marriage is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the "[p]rotection of offspring, property interests, and the enforcement of marital responsibilities." Ibid. United States v. Windsor, 570 US 744, 766 [2013].
A similarly compelling State interest is New York's (and the child's) right to know whether his parents are married. New York has a "strong presumption of marriage," especially when it concerns the legitimacy of children:

"Where persons live and cohabit as husband and wife, and are reputed to be such, a presumption arises that they have been legally married, and this presumption, especially in a case involving legitimacy, can be rebutted only by the most cogent and satisfactory evidence" (Matter of Lowney, 152 AD2d 574, 575 (2d Dept. 1989)). That court quoted Judge Andrews from the often cited case of Hynes v. McDermott (91 NY 451 (1883)) wherein he stated, "The presumption of marriage, from a cohabitation, apparently matrimonial, is one of the strongest presumptions known to the law. This is especially true in a case involving legitimacy (of the couple's children). The law presumes . . . marriage, and . . . legitimacy . . . . Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence."
Amsellem v Amsellem, 189 Misc 2d 27, 29 [Sup Ct, Monroe Cnty 2001] (collecting cases).
As this Court previously stated, the court has no authority to determine the validity of the alleged marriage under religious law; the dispute must be determined on the application of neutral principles of law and without reference to religious principles. Similarly, although courts may not wade into "religious principles" when addressing intra-church disputes, courts may inquire into even intra-church disputes such as a church and Synod property dispute in Eltingville Lutheran Church v. Rimbo, 174 AD3d 856, 858 [2d Dept 2019], "when the case can be decided solely upon the application of neutral principles of law, without reference to any religious principle. . . The court must apply objective, well-established principles of secular law to the issues and may rely on internal church governing documents, but only if those documents [*4]do not require interpretation of ecclesiastical doctrine. The focus is on the language of the deeds, the terms of the local church charter, the State statutes governing the holding of church property, and the provisions in the constitution of the general church concerning the ownership and control of church property." Similarly, for example, although "membership in a church is a core ecclesiastical matter," an individual's membership in a church is a form of a property interest and may be addressed on neutral principles. Tubiolo v. Abundant Life Church, Inc., 167 N.C. App. 324, 328 [NC 2004]. The Tubiolo court addressed the narrow issue of whether those plaintiffs' membership was terminated in accordance with the church's bylaws—whether bylaws had been adopted by the church, and whether those individuals who signed a letter revoking the plaintiffs' membership had the authority to do so, which "inquiry can be made without resolving any ecclesiastical or doctrinal matters." Id.
In Amsellem, a couple was married by a rabbi in France, apparently in violation of at least certain French provisions that would have required them to first obtain a civil marriage before the religious one, and their rabbi was also supposed to conform with certain provisions or face fines. The parties then returned to New York, where they lived as husband and wife for over ten years, filed tax returns, and had five children. When the wife filed for divorce, however, the husband argued that the marriage was not valid and sought to dismiss the divorce suit. The Amsellem court upheld the marriage, finding that the husband did not overcome the "strong presumption" of marriage and legitimacy, and although he was able to establish that under French law that the rabbi violated provisions and faced fines, the husband did not sufficiently prove that the marriage itself also had to be invalidated. Id
One party's later statement about the intentions during the ceremony need not be relevant, only the fact that the ceremony took place. In Hirsh v. Stern, defendant sought a determination that the parties' marriage was null and void on the ground that the parties "never intended to be married, but had participated in the religious wedding ceremony solely to deceive the members of their community who disapproved of their nonmarital relationship." 83 AD3d 783 [2d Dept 2011]. The other spouse disagreed with this statement, and the Appellate Division, Second Department held that as the parties' ceremony comported with DRL § 12, defendant's statements did not invalidate that marriage. Similarly, in Ahmed v. Ahmed, defendant alleged that the "parties' wedding ceremony was a 'purely religious marriage' without any intended legal consequences," and the Appellate Division, Second Department held that as the parties' ceremony comported with DRL § 12, defendant's statements did not invalidate the parties' resulting civil marriage.
As recently stated by the Appellate Division, First Department, a civil "marriage is valid" where the party seeking to disavow the religious marriage that created the civil one, fails "to overcome New York's strong presumption favoring the validity of marriage." Spalter v. Spalter, 224 AD3d 419, 420 [1st Dept 2024]. This is especially the case where, as here, the parties have children, whose legitimacy is concerned (in Spalter, the parties had children born before and after the ceremony). In Spalter, the parties specifically executed a document "that stated that their Jewish religious marriage was not to be 'legally recognized' under New York law, the parties were deemed to have nevertheless entered into both a civil and religious marriage, especially in light of their acknowledgment in that same document that they were 'entering into a marriage that is binding under Jewish law.'" Id. In Spalter, wife also filed tax returns as "single," but this did not invalidate the marriage. Id.
The Spalter court distinguished the finding of a trial court in a different (but somewhat [*5]factually similar) case, Devorah H. v. Steven S., 49 Misc 3d 630 [Sup. Ct., NY County 2015]. In Devorah, an Orthodox Jewish religious ceremony was not found to have created a civil marriage pursuant to DRL 12 and 25 where the ceremony "took place in the rabbi's office on Manhattan's Upper West Side, lasted a matter of minutes, and the only people there, other than the parties and the rabbi, were two unidentified, and now forgotten, elderly men who were recruited on the spot to be witnesses. Needless to say, there was no video, or for that matter photographs, to mark the event." Id. The ceremony was apparently arranged by the rabbi who was helping the parties move to a larger apartment because Administration for Children's Services was investigating their allegedly cramped quarters, and the rabbi performed the ceremony as the rabbi did not feel comfortable moving unmarried parties (and plaintiff's four children from her prior marriage) into an apartment without the couple marrying. The alleged husband said that there was no ketubah (Jewish religious contract) and the alleged wife said that the "husband" tore it up immediately after leaving the rabbi's office. The rabbi testified, "Maybe they were fooling me. I don't know. I don't know." Id. In the recent Appellate Division, First Department Spalter case, the Deborah case is distinguished as follows: "As the [Spalter] parties' marriage was solemnized by a rabbi with witnesses in a traditional Jewish ceremony, their failure to obtain a marriage license does not invalidate the marriage (cf. Devorah H. v. Steven S., 49 Misc 3d 630, 12 N.Y.S.3d 858 [Sup. Ct., NY County 2015]). That the parties may not have intended to have their marriage legally recognized under New York law is not dispositive because 'while marriage is a contract between two consenting individuals, it is a special status governed by laws and the State and not determined by those entering the contract.'" Spalter, 224 AD3d at 421.
Religious ceremonies need not be "perfect": one trial court, in upholding the validity of a civil marriage based on a religious ceremony that looked like a wedding (that defendant said was not meant to be one, and the parties meant to have a civil one later but never did): "[t]here is an old cliche that goes 'if it walks like a duck and quacks like a duck, and looks like a duck, it's a duck.' This familiar maxim appears perfectly suited to the case at the bar, as it conforms with the intent underlying the statutory structure enacted by the Legislature. Essentially, the Domestic Relation Law establishes that where parties participate in a solemn marriage ceremony officiated by a clergyman or magistrate wherein they exchange vows, they are married in the eyes of the law." Persad v. Balram, 187 Misc 2d 711, 713 [Sup. Ct., Queens Cnty 2001].
Similarly, a trial court recently addressed a case with a religious ceremony, and then, years later, claims by one side that the ceremony was not valid under that religious law and therefore, there was also no civil marriage created. T.I. v. R.I., — NYS3d —, 2024 WL 1290631, 2024 NY Slip Op. 24090 [Sup Ct, Kings Cnty Mar. 20, 2024]. The trial court addressed that there is both a religious marriage "recognized by the parties' religious community and a separate marriage that is recognized by the State of New York [the 'civil marriage']." Id. at *11. Thus, even if the religious community does not recognize the religious marriage, the New York civil marriage will nevertheless continue. In that case, T.I. v. R.I., the parties' religious officiant had apparently been excommunicated prior to their ceremony, and there were certain other religious flaws with the ceremony and information provided, such that a rabbinical court, on "husband's" years-later request, issued a certificate that the religious marriage was void.
Nevertheless, the civil marriage that was "created" at that religious ceremony continued, regardless of a religious ruling on the validity of the religious marriage:
Parties cannot avoid the obligations and liabilities that result from a marriage recognized by the State of New York even where they attempt to limit their union to a religious [*6]marriage and to, in effect, "write themselves out" of DRL 12 (id.). The statutes and well-established case law protecting the State of New York's expansive and inclusive policy of providing solemnized marriages with the protections — as well as the obligations — of civil marriage is articulated in Spalter.
Id.
These cases are different from those where the courts have held that religious ceremonies were not sufficient to create a New York civil marriage: In Bernstein v. Benchemoun, the parties were first married in Florida in a Jewish religious ceremony, executing a ketubah (a marriage contract) but there is no dispute that Florida does not recognize a civil marriage without a license under those circumstances. 216 AD3d 893, 894, [2d Dept] leave to appeal denied, 40 NY3d 906 [2023]. The parties then came to New York, and executed a second ketubah with a rabbi in New York. At the hearing, the New York rabbi testified that he could not have married the couple, as they were already married under Jewish law. There does not appear to have been any other information about a ceremony in New York (including whether there had ever been one at all), and the Appellate Division, Second Department found that "A finding that there was a solemnized marriage [in New York] would require an analysis of religious doctrine, which could offend the First Amendment of the United States Constitution. Thus, under the circumstances, the Supreme Court could not determine that there was a cognizable marriage in New York." Id.
There was also no competent evidence of a New York religious ceremony in Yusupov v. Baraev, 197 AD3d 538, 539 [2d Dept 2021]. The alleged wife and her mother testified that there was a ceremony in the rabbi's apartment, but no photographs, or any record of it existed, other than a ketubah with signatures in Hebrew. The court found that the defendant and his mother testified more credibly that there was no ceremony and that the Hebrew signature was not his, as he did not write in Hebrew. Id.
Similarly, there was no New York civil marriage found in Ponorovskaya v. Stecklow, 45 Misc 3d 597, 599 [Sup. Ct., NY Cnty 2014], where the New York resident couple traveled to Tulum, Mexico for a destination wedding ceremony, officiated by one of their cousins, who became ordained on the internet for this occasion. The parties did not comply with any Mexican marriage registration requirements (which would not recognize the parties' marriage without same), and they never obtained a New York civil marriage license, either. The hotel sent them the requirements list, which they did not follow, and on the hotel's questionnaire, they crossed out "civil" and "religious," writing "symbolic" in all capital letters to describe their intended ceremony. The Court distinguished In Re Farraj (discussed infra), stating that the parties in this case chose the Tulum location as their vacation choice, not out of religious (or other) necessity, and "once there did not make any attempt to follow the local laws." Under all of the circumstances in that case, the court found that the parties had no "justifiable expectation" that they were married. Id.
An out-of-state religious ceremony has been held sufficient, however, at least in some cases, such as In re Farraj, where there was a justifiable reason to so hold. In Farraj, the widow credibly testified in Surrogate's Court (as against the decedent's adult son from a prior relationship) that the parties were married in New Jersey by a New York imam, and then resided in Brooklyn, with the wedding taking place in New Jersey only because it was a religious requirement to be married in the home of her oldest male relative. 72 AD3d 1082, 1084 [2d Dept 2010]. The court held that the spouses "had a justified expectation that they were married, since they participated in a formal marriage ceremony in accordance with Islamic law" and that the [*7]"only reason [they] had their marriage ceremony in New Jersey was because, under Islamic law, the marriage ceremony was to be conducted in the residence of the bride's eldest male relative, which was the petitioner's brother." Although a religious-only marriage would not be sufficient in New Jersey, which requires a civil certificate, the Court upheld the marriage under New York DRL 12, finding that "New York has a significant interest in the marriage between the petitioner and the decedent. While New Jersey has an interest in enforcing its marriage requirements, this interest is not particularly strong here, since the petitioner and the decedent left New Jersey immediately after the marriage ceremony, and lived in New York for the entirety of their marriage." In re Farraj, 72 AD3d at 1084.
In the instant case, the question then, is whether the parties' religious ceremony created a civil marriage. Unfortunately for the parties, they never obtained a civil marriage license (nor were they required to by New York law), but if they had, this lengthy motion practice and trial would have been obviated. The hearing was made somewhat shorter by their consent to utilize direct by affidavit (with live cross, re-direct, and re-cross) for each of the parties (each of whom had counsel) and for some of their third-party witnesses, again on consent and with each party represented.
The hearing was greatly lengthened, however, by the delays due to extensive motion practice related to whether the officiant (Bishop A.B.) would testify, and whether the other clergy member present in church on the day of the ceremony in question (Father H.H.) would also testify. See 25-page Decision and Order (declining to quash a subpoena for the testimony of Bishop A.B.), available at L.F. v. M.A., 78 Misc 3d 787 [Sup Ct, NY Cnty 2023]; 36-page Decision and Order (again declining to quash a subpoena for the testimony of Bishop A.B. on a motion by different counsel with certain new arguments); 17-page Decision and Order (declining to quash a subpoena for the testimony of Father H.H.). Those three decisions are incorporated herein by reference.
While the court and parties waited for Bishop A.B. to testify (and for the motions about compelling his testimony to be briefed, decided, and time allowed to seek an appellate stay, if so desired), each of the parties called an expert. Although this Court may only reply on neutral principles of law, Avitzur v. Avitzur, 58 NY2d 108 [1983], here, each expert testified about Coptic Orthodox wedding customs, requirements, and rituals, and whether the parties' ceremony (whether from witnesses' testimony or photographs) was a wedding or not, within that expert's understanding. Plaintiff's expert witness opined (based in part on the undisputed photographs of that day) that there was a wedding ceremony, with Defendant putting on the "bornos" ceremonial robe for that one ceremony (and not for the two baptisms). The expert testified that this is a robe that a Coptic Orthodox man would wear only to be ordained as a priest or for his wedding as the groom (and it is undisputed that Defendant was never ordained), and therefore, the only reason to wear a bornos was for a wedding. Plaintiff's expert further testified that the red ribbons that the couple put on that day for that third ceremony were in place of metal "crowns" traditional for a Coptic Orthodox wedding ceremony, because there were no metal crowns present in church that day.
Defendant's expert, on the other hand, testified that the parties could not have been married that day because the red ribbons are not crowns, and because she understood from Defendant that the ceremony was a blessing only. She also testified that certain mandatory pre-wedding training became mandatory as of June 2017 in the Coptic Church, and that the parties would have signed a contract concerning which she saw no evidence.
The court "received" the expert testimony only on two issues, where there is no disagreement (and therefore, the Court is not resolving a religious dispute) — both experts stated and agreed that a "bornos" ceremonial robe is only worn by Coptic Orthodox men to be ordained as a priest or for his wedding. This statement is not controverted and was also agreed with by Bishop A.B., Father H.H., both experts, and other non-party witnesses, and was not controverted by any witness, and is therefore, accepted under neutral principles of law. Here, all agree on the only two possible roles for the bornos, and all also agree that Defendant was not ordained a priest. All also agreed that there are no "vows" exchanged in a Coptic wedding, although that tradition may be changing. 

Thus, as the court is bound to determine the herein motion by reference to "neutral principles" of law, and not the court's interpretation of disputed religious doctrine, therefore, the court could not base its decision on either expert's interpretation of whether this particular Coptic Orthodox Church in this city and year would or would not allow this type of crown, whether citing to other religious ceremonies currently or from the 19th century, from this church, country, or other countries and continents. Either expert's understanding (even if deeply informed by their scholarship) of the inner workings of the Coptic Orthodox Church and practices cannot be the basis for the decision of whether the parties were married.
Indeed, the Court can neither create nor invalidate a marriage on the basis of whether the particular religious officiant fully or partially followed the rituals and customs appropriate to their congregation:
Here, the determination of whether a marriage recognized by the State of New York exists between the parties separate and apart from any religious marriage rests not upon religious doctrine but upon neutral principles of law.
Any religious determinations and any ramification of religious doctrine made by the rabbinical court as to the parties' religious marriage are separate and apart from the Supreme Court's jurisdiction over whether, based on neutral principles of law, there exists here a marriage recognized by the State between the parties.
The question before this Court is whether the State of New York continues to recognize a marriage between the parties separate and apart from any unilateral [declaration by the religious authorities regarding the parties'] solemnization ceremony. The wife only seeks a civil divorce from a marriage recognized by the State of New York pursuant to DRL 12: she is not seeking to enforce against the husband any religious practice arising out of principles of religious law (see generally Avitzur v. Avitzur, 58 NY2d 108, 459 N.Y.S.2d 572, 446 N.E.2d 136 [1983][holding that the case could be decided solely on application of neutral principles of contract law without reference to any religious principles where party sought to compel defendant to perform a secular obligation to which he contractually bound himself in the parties' religious marriage contract [the "ketubah"] so there was no constitutional barrier to the relief sought). . .
[T]his Court has independent jurisdiction to adjudicate any secular obligations that may flow from any marriage recognized by the State of New York that may exist separate and apart under DRL 12 from any religious doctrine questions (see generally Avitzur, at 114-115, 459 N.Y.S.2d 572, 446 N.E.2d 136; see also Fischer v. Fischer, 237 AD2d 559, 655 N.Y.S.2d 630 [2 Dept.,1997]; see also Schwartz v. Schwartz, 79 AD3d 1006, 913 N.Y.S.2d 313 [2 Dept.,2010]["the relief sought by [the wife] is simply to compel [the husband] to perform a secular obligation to which he contractually bound himself"]).
In seeking a divorce of the parties' marriage recognized by the State of New York, the wife merely seeks to compel the husband to meet any secular obligations he may have that may arise out of any marriage recognized by the State of New York that continues independently of any change to the status of the religious marriage. As such, there is no question before this Court that would violate the First Amendment.
T.I. v. R.I., 2024 NY Slip Op. 24090, 2024 WL 1290631, at *9.
This cleaving into a civil marriage and a religious one was recently addressed in TI v RI: "There is [ ] no requirement in DRL 12 that the religious solemnized marriage continue as a predicate for the State of New York to continue recognizing the underlying marriage. . . . Rather the State of New York recognizes that, upon solemnization pursuant to DRL 12, two (2) separate yet equally recognizable marriages exist: the religious marriage recognized by the parties' religious community and a separate marriage that is recognized by the State of New York [the 'civil marriage']." Id. at *11. Thus, even if the religious community does not recognize a religious marriage, the New York civil marriage will nevertheless continue [for example, as in T.I. v. R.I., the parties' religious officiant had apparently been excommunicated prior to their ceremony, and there were certain other religious flaws with the ceremony and information provided, such that a rabbinical court, on "husband's" years-later request, issued a certificate that the religious marriage was void, nevertheless, the civil marriage "born" at that ceremony continued].
In this case, Bishop A.B. testified as follows: when he is present in a Coptic Church, he is the officiant. Father H.H. was present that day, but Bishop A.B. conducted the liturgy and the ceremonies. He baptized the child, and then, the mother, but he did not marry the parties that day (or any other day). He performed a prayer of blessing of them (Plaintiff and Defendant) for about 10 minutes, does not recall what would have been in that prayer from six years ago (at the time of his testimony), maybe a prayer of thanksgiving or blessing. Bishop A.B. also stated that a blessing prayer could be in the Coptic language, Arabic language, English language, he could not remember which language he would have used six years ago, may have been majority English, but he could not be certain.
Bishop A.B. was shown the two signed (baptism) certificates, and the unsigned (marriage) certificate. Bishop A.B. did not know why the officiant was listed as Father H.H. on the baptism certificates, instead of Bishop A.B. (who undisputably officiated the baptisms). He stated that Father H.H. would have printed the certificates, and he should be asked, not Bishop A.B.. Similarly, Bishop A.B. did not know why Father H.H. apparently prepared a wedding certificate, again stating that Father H.H. should be asked about this.
There were at least three strange and what could be seen by some as inconsistent statements by the Bishop during his testimony. On the one hand, he stated that he did not marry the parties and there would not be an impromptu marriage ceremony in the Coptic Church. He added that this was his religious ruling — that they did not get married that day. On the other hand, when asked whether he remembered asking the parties that day whether they wished for him to marry them, he said that he could not recall and could not answer that question. He also stated that he could not recall whether he knew that day whether the parties were married or the nature of their relationship. Lastly, regarding the red ribbons, the Bishop stated that he put them on the parties' heads because they did not have crowns on hand for the crowning ceremony. He then corrected that there was no crowning ceremony. Later, the Bishop stated that this was not a [*8]crowning ceremony, and if they had crowns, he would have put crowns on their heads.
The extent to which Bishop A.B. may have religious authority to make a current religious determination about the parties' religious ceremony is separate from this Court's question of whether the religious ceremony that day created a civil marriage (see T.I. v. R.I., supra). The Court in no way seeks to disturb or pass judgment on that entirely separate religious determination.
Father H.H. then testified as follows: he had only found out one day before his testimony that Bishop A.B. had said that there was no marriage. Father H.H. has not discussed this case or his testimony with Bishop A.B.. He acknowledged his obedience to the Bishop, as necessary within the Church. He also acknowledged that if he were to speak contrary to the Bishop, he could be moved from parish to parish, depending on the scenario. 
Father H.H. then testified that he has seen Bishop A.B. perform over five weddings, and he (Father H.H.) has performed over twenty weddings. On that date (in 2017), Bishop A.B. baptized the child and then Plaintiff. Although both Father H.H. and Bishop A.B. were present, whenever the Bishop is present, he is the officiant. At this point, Father H.H. was shown the baptismal certificates and asked why he is listed as the officiant. He stated that they use a template, which lists Father H.H. as the officiant in this church, and he may not always correct the template. He added that he signed it since he was present that day, even if Bishop A.B. officiated. Father H.H. stated that he was not aware that in New York a civil marriage can be recognized with religious marriage solemnization even in the absence of a civil license. As for why the printed marriage certificate was not signed, he stated that he waits for the parties to sign, but also that he has a stack of these religious certificates in the church that were never collected by other couples, whose marriages he stated are valid (for all of those, Father H.H. testified, the couples also had a civil certificate that he filled out and mailed to the appropriate government entity to process the parties' civil marriage certificate).
Father H.H. explained that he had met Defendant before the baptism, when he came into the church to request for his son to be baptized. Father H.H. asked Defendant why baptize the child if Defendant was not practicing. Defendant said that it was his mother (the child's paternal grandmother) who wanted the child baptized. Father H.H. also asked about the child's mother, whether she was a baptized Copt (at that time, she was not). Father H.H. stated that as a priest he would want to make sure that a child follows faithfully in the church and is raised in the church, and Father H.H. stated that he was reluctant to baptize a child when the parents were not attending church and would not likely bring the child. At that point, Defendant said that he might need to speak to the Bishop, and Father H.H. said that he should do that if he would like to. Later, it was Bishop A.B. who apparently moved forward with scheduling the child's baptism.
Father H.H. then testified about the ceremonies on [redacted] 2017. He had provided the certificates in response to the documents subpoena, and he had one photograph (Ex. 35) of the event in his files. He described it as a unique picture because a red ribbon was wrapped around their heads, it was an ornamental crown. He did not recall who placed ribbons on them, whether Bishop A.B. or someone else had done so. He added that they were not wearing the crowns until after the baptisms. In describing the photograph, Father H.H. added that you can see two ribbons "on the bride," Plaintiff, (calling her "bride"). Father H.H. could not recall whether there were crowns at the church at the time, he thought not, but was not certain. Father H.H. also stated that Defendant is wearing Father H.H.'s "bornos" robe, the robe in which Father H.H. was ordained. He could not recall who requested this robe for Defendant.
Father H.H. testified that after the mother's baptism, he took her confession. Father H.H. testified that to be married, both partners have to be baptized in the faith.
Father H.H. prepared all three certificates at the same time, whether on that date or within a week. He stated that he prepared the marriage certificate because that is what it looked like - he saw the ribbon, it looked like the conjoining of the two, and the bornos was utilized, so he just made the assumption that they were married. He was at the altar. When asked if there is any other explanation for the bornos and the red ribbons other than it was a wedding, Father H.H. at first answered that no, there was no other explanation.
Later, on cross-examination, Father H.H. testified that, while he created the marriage certificate because he thought there was a wedding, now, he agrees that there was no wedding on that date and agrees that generating the marriage certificate was a mistake. On re-cross examination, Father H.H. added that it looked to him that a wedding had occurred, that is what he believed happened and that he did not question it at all. On redirect by Plaintiff's counsel, Father H.H. was also asked whether, when he said that it was a "mistake" to say that a wedding had taken place, whether the reason for him to say that it was a "mistake" was because Bishop A.B. said the ceremony was not a wedding. Father H.H. agreed with that statement. He was then asked whether that was the only reason. He agreed with that statement as well. 
Father H.H. testified that it was not until one day before his testimony that anyone told him that these parties are not married. Father H.H. then discussed a meeting he had with Defendant years after 2017, when Defendant called to pick up the child's baptismal certificate. Father H.H. thought this was approximately a year before his testimony. When Defendant came to pick up the child's baptismal certificate, Father H.H. said that he also still has the certificates for Plaintiff's baptism and marriage. Defendant then said that they are no longer together (or similar words to that effect, Father H.H. was not certain of the exact words that Defendant used, but was certain that he meant that the couple was breaking up and no longer together). Father added that Defendant got quiet. He never said that they were not married, did not ask why there is a marriage certificate if they were never married, and never said anything about the marriage certificate or picked up the marriage certificate. Then, since the parties were no longer together, Father H.H. did not try to give Plaintiff's baptismal certificate or the marriage certificate to Defendant at that time. He did keep them at the church, and produced them pursuant to the document subpoena.
Plaintiff's witness, L.G., testified as follows, in relevant part: he was a good friend and attorney for Defendant, and then for both parties, and attended all three ceremonies at the church that day. The last ceremony, he understood, was the parties' wedding. Only the child's baptism had been planned, and he was invited to the baptism and a planned lunch celebration thereafter at a local restaurant. According to this very credible witness, after the child's baptism, there was a surprise baptism of the mother and what looked like a wedding. At the post-church lunch, Defendant asked him to give a toast, and Mr. L.G. did give a toast, congratulated the couple on their wedding and wished them a happy life. He also heard other toasts to the groom and bride at this lunch. He remembered that both Plaintiff and Defendant were in very good spirits at the lunch, smiling, and appearing happy.
Mr. L.G. also testified that after the 2017 ceremony, he did legal work for the couple, including filing a verified complaint, sworn by Defendant, in [Defendant here] and [Plaintiff here] v. [non-party] in this Court (before a different Justice of this Court). The Verified Complaint in that action was admitted as Plaintiff's Ex. 21. At the start of that 2019 verified [*9]complaint, it states that the parties are married:
VERIFIED COMPLAINT.
Plaintiffs, [redacted] and [redacted], by their attorney, [redacted], Esq. ([redacted], P.C.), as and for their Verified Complaint, respectfully shows to the Court and alleges:
Summary of this Action.
1. In this action, the plaintiffs seek to recover from the defendants the monies [Defendant here] paid to defendants [ . . . ] for installation into plaintiffs' new [business that [Defendant here] owns with his wife ([Plaintiff here]) at [redacted] in New York County.
[Ex. 21, Verified Complaint](emphasis added)
Defendant here verified this complaint (Ex. 21 at 15), as follows:
VERIFICATION.
State of New York
County of New York
[Defendant here], being duly sworn, says
I am one of the Plaintiffs in this action. I have read the foregoing Complaint. All of its allegations are true to my own knowledge, except as to any on information and belief and as to those, I believe them to be true. My personal knowledge includes documents (including emails) referred to in the Complaint and the books etc. of [the business].
[sworn]
Mr. L.G. testified about this Exhibit 21, as well as Exhibit 7, the motion to compel in that same action, which Mr. L.G. signed and filed, again stating that plaintiff [Defendant here] is married to [Plaintiff here]. Mr. L.G. testified that Defendant here never said that they are not married, and never at any point in that lawsuit did Defendant here correct what Mr. L.G. had written concerning the parties being married. Mr. L.G. was very clear and credible. He attended the parties' wedding, he was asked to and did give a wedding toast, he filed sworn litigation documents that Defendant here was married to Plaintiff here, and he was testifying as to the truth of what he sincerely believed.
Defendant, when later testifying, stated that while he recalled the lawsuit, he did not read what he had signed or sworn to. The Court does not credit this statement. First, it is not credible that Defendant would not have seen "wife" on the first page, in the first paragraph, immediately after his own name, in his affirmation in a very important lawsuit, or that L.G., an experienced attorney, who also knew both parties well, would have drafted such a statement and section when it was entirely wrong and fictional, as Defendant now suggests.
Defendant also testified that while he wore the bornos and red ribbons during the 2017 ceremony, he closed his eyes and does not recall who put them on him. The Court notes this is also unlikely, but the Court need not find this particular piece credible or not credible.
Defendant also testified about his misunderstanding and why he signed a retainer for a post-nuptial attorney in August 2021, but now says that the parties were not married, so would not have needed a post-nuptial agreement. Specifically, Defendant hired a highly experienced New York matrimonial attorney to draft a post-nuptial agreement in 2021, at a time when it is undisputed that the parties were not getting along and may have been separating as a couple. Defendant testified that the reason for this attorney was that he was thinking of buying a house with Plaintiff in [another country] at that time (in spite of the possible separation) and he had [*10]been told by someone that they might be considered "married" pursuant to common law in [that other country], which is why he hired a post-nuptial attorney. No invoices or other information were presented from this attorney, so it is not clear how extensive the post-nuptial representation was. Defendant then testified that he was eventually told that because the parties reside in New York and not [that other country], that the laws of New York would apply, and therefore, he did not need the post-nuptial agreement. The Court is greatly skeptical of Defendant's explanation, not least because the parties were always resident in New York and not [the other country], and were in the process of separating and not purchasing more houses together, but nevertheless, the Court notes that this hiring (for however long) of counsel for a post-nuptial agreement was not a deciding or even controlling factor.
Defendant also testified that although his attorney filed for divorce on Defendant's behalf from Plaintiff in herein Court, Defendant himself did not sign anything in that divorce lawsuit. A review of the filed papers in that action reveals that the Summons with Notice was signed by his counsel only. Defendant's five-page affidavit in support of his motion in that case was signed by him, but the affidavit is only about the parties' son, and while it states "I am the plaintiff in the instant action," it does not otherwise state whether the parties are or are not married, and focuses on the child, seeking his return from [another city], where the mother allegedly overstayed a planned vacation. His counsel filed a Notice of Discontinuance many months after parties appeared in this, Plaintiff's matrimonial action, including on the issue of the return from the vacation.
Here, at trial, the Court did hear from each of the parties, several witnesses present that day (those for Plaintiff stating that they witnessed a wedding, and those for Defendant stating that they did not), Bishop A.B., and Father H.H.. Neither party was entirely credible, and there were truly great credibility "holes" in each party's testimony, which, therefore, greatly complicated and extended the hearing. In the end, the Court had to place significant weight on the uncontroverted testimony and exhibits, and to compare that with the modicum of credible recollections presented, to arrive at the only possible conclusion.
Here, the following facts are not in dispute: there was a religious ceremony for Plaintiff and Defendant on [redacted] 2017 (after the baptisms), by Bishop A.B., with Father H.H. present, in the church, with their guests, during which Defendant wore a bornos (a robe that is worn by men in the Coptic Orthodox Church only to be married or ordained, and he was not ordained). Afterwards, Father H.H. printed up a wedding certificate because he thought what he saw was a wedding (that certificate was never signed), and Father H.H. did not question that it was a wedding until just before his testimony, when he found out that Bishop A.B. ruled that it was not a wedding. After the ceremony, and never before, Defendant placed [businesses] in Plaintiff's name, actions that never would have occurred had the parties not been married. Years after the ceremony, Defendant swore in a lawsuit that he is married to Plaintiff. Years after the ceremony, Defendant hired an attorney for a postnuptial agreement (which was never completed or signed). Each of the parties filed for divorce in this Court, although Defendant did not personally sign his summons.
The main two factors in Defendant's account that make it clear that Defendant understood that he was married to Plaintiff: his property transfers and his court filings. At the time of the 2017 ceremony, the parties already had a young child and had been living and working together for years, yet, at no point did Defendant place any property in Plaintiff's name. After the ceremony, however, Defendant placed several [businesses] in Plaintiff's name. Both parties (if [*11]they are considered as a marital unit) benefited from the title being held in Plaintiff's name, apparently for certain governmental approvals and certification as a "woman owned" business. There was no contract, agreement, loan, promise to return, or otherwise, for these [business] transfers, which, given Defendant's undisputed "concerns" about money cannot be squared as anything other than a "guise" transfer to his spouse after the wedding, for him (or them as a couple) to benefit from the license and other "woman owned" business preferences, but without completely giving up any possible benefit from the [businesses] if these transfers were not to his wife, and thus still subject to either equitable distribution in case of divorce or other applicable laws in case one predeceases the other.
Also, in a prior unrelated lawsuit in this Court (before a different Justice), Defendant filed a sworn affidavit, stating that he is Plaintiff's husband. The lawsuit was related to one of the businesses that Defendant placed in Plaintiff's name. The court need not decide whether, for that lawsuit, the fact that the parties were married would have likely been a central standing issue for Defendant to be able to be a plaintiff in that lawsuit, as he did not own the [business]. His sworn declaration that [Plaintiff here] is his wife is important, as it demonstrates that at least at that time, he so understood, and thus, it is likely, that he had a "justifiable expectation" that they were married, even if he now denies it.
Then, in 2021, Defendant hired matrimonial counsel who filed for divorce in this Court. That action was never served and was withdrawn. Defendant attempted to explain away even this, stating that he was not aware of this filing by his attorney. Defendant's counsel, however, is an extremely experienced matrimonial attorney, with decades of practice in this court, and it is unimaginable to this Court that he would have filed a divorce action with no basis as between two unmarried dating people. The Court also notes, although does not rely on, the fact that this specific attorney moved to withdraw, Defendant's new counsel was hired, and then the prior counsel agreed to remain as co-counsel (as opposed to former counsel) but did not further appear in the case, and did not testify to explain this divorce filing. The Court absolutely does not fault that attorney for not testifying, nor Defendant for not waiving attorney-client privilege to call his former or present counsel. What the Court does consider, however, is the actual filing for a divorce with Defendant here as plaintiff, as but one piece in the overall puzzle.
Both parties testified that they referred to each other as husband and wife, and did not correct either each other or others when they so referred to them. Both agreed and acknowledged that there were certain instances of them calling each other that even before the 2017 ceremony, however, with Defendant stating that he did this out of deference to Plaintiff, especially within the Arabic community. Here, referring to each other as spouses would not create a marriage, but to the extent that they continued to do so extensively, does lend some additional weight to the idea that they were in fact married.
The logic and consistency of Defendant transferring valuable businesses to Plaintiff after the ceremony (and not before), and him filing for divorce with an experienced matrimonial attorney in this court (and stating that he is married to Plaintiff in another legal filing, by another experienced attorney, which filing Defendant signed under penalty of perjury), all lead to the inescapable conclusion that Defendant was married and that he so believed as well. His later desire to disavow the marriage (and its concomitant financial obligations) is not relevant to whether there was a sufficient religious ceremony to create a civil marriage. 
Bishop A.B. testified that he oversees 40 churches in six or seven states. He had not met Plaintiff and Defendant prior to [redacted] 2017, and although he did stop by their businesses [*12]several times in subsequent years, he remembered only that Plaintiff was nice to him, not whether she ever thanked him for marrying them. The Court finds that Bishop A.B. was sincere in his testimony; however, the court finds that he did not display an accurate present recollection of events dating back six years before his testimony, as even the Bishop himself allowed, several times, when he stated that he could not recall something (understandably so, of course, given both the passage of time and the importance of all of his other duties in all of the other churches that he visits and oversees). It is important to note that the court specifically rejects Plaintiff's unsupported insinuation that Bishop A.B. was testifying that there was no wedding ceremony because of donations Defendant or his family made to the church. Under neutral principles of law, the Court must receive and evaluate Bishop A.B.'s testimony as a fact witness, who may or may not always remember everything exactly as it happened.
Father H.H., who is the priest in this specific church, contemporaneously created the three certificates. He credibly testified that he thought what he saw was a wedding, and indeed, he had not been aware of the controversy (whether there was or was not a wedding) until shortly before his testimony appearance in 2024. He did not know why the name listed on all three certificates was his (Father H.H.) and not the higher ranked church official present that day (Bishop A.B.), except that this is the template format. Both Father H.H. and Bishop A.B. testified (uncontroverted and credibly) that whenever the Bishop is present, the church priest takes a supporting role, and it is the Bishop who would officiate that day. It is also entirely undisputed that Bishop A.B. (and not Father H.H.) conducted both the child's baptism and Plaintiff's baptism, and yet, it is Father H.H.'s name and signature on the two baptism certificates. Father H.H. stated that this did not make a difference to the validity of the baptisms.
Father H.H. also testified credibly that many years later, approximately a year or so before his testimony, Defendant made an appointment to pick up the child's baptism certificate. At the time, Father H.H. also had Plaintiff's baptism certificate and the unsigned marriage certificate. Father H.H. testified that he showed all three to Defendant, who said that the parties are breaking up (or separating or similar words, Father H.H. was understandably uncertain about the exact language Defendant used, but he was certain about the import of the message — that they were no longer together as a couple), and Defendant did not take either Plaintiff's baptism certificate or the [unsigned] marriage certificate, nor did Father H.H. expect him to do so under the circumstances of the parties breaking up. Defendant did not, however, say anything to Father H.H. to question the validity or propriety of a marriage certificate, did not say that there is no reason or basis for it, that they were never married, or similar words that one would expect if the parties were actually never married, and especially so if they were breaking up and not planning to remain together or to marry. 
Father H.H. then maintained the unsigned marriage certificate, together with Plaintiff's baptism certificate and a copy of the child's baptism certificate in his office, where, he testified, he has many such never-picked-up certificates (presumably because the other married couples also obtained a New York State marriage license and received a formal New York State marriage certificate).
Here, the Court notes that Plaintiff's testimony that at some point she saw the parties' marriage certificate folded up in the visor of Defendant's car is not credible — both because Father H.H. did not give the certificate to anyone prior to these proceedings, and to a lesser extent, because it did not appear credible that a visor is where a marriage certificate would be kept or that Plaintiff, if she did see it there, would not have taken it and moved it to a more [*13]logical place, or at least taken a cellphone photograph of it. Plaintiff also testified about details of the ceremony that later turned out to not have been true or possible — that the parties had a "quick" kiss after the ceremony and that the officiant pronounced them husband and wife. It was uncontroverted by all witnesses that there is no "kiss" (quick or otherwise) as part of a Coptic marriage ceremony, nor does the officiant end the ceremony with words to the effect of pronouncing the married couple as "husband and wife."
The Court does not need to decide whether Plaintiff misremembered the ceremony, misunderstood parts of the ceremony (it is undisputed that English, Arabic, and Coptic were all spoken, and Plaintiff does not know Coptic), conflated her recollection of these details with other ceremonies, or intentionally (or casually) lied to the Court to bolster her point about the ceremony that she understood to be the parties' wedding ceremony. Again, it is not up to this Court to pass on the propriety of Coptic Orthodox marriage ceremonies or why Coptic officiants apparently do not pronounce the parties "husband and wife", even if this is done by officiants in many other denominations (Christian or not Christian). The Court only notes that Plaintiff's testimony was not entirely accurate. She was, however, accurate in the crucial components, solely as backed up by photographic evidence and other testimony, including those moments (very few) where the parties' testimonies matched.
Parties vehemently disagree about the length of time of the ceremonies, with Plaintiff alleging that they took a much longer amount of time than Defendant states they did. There is no video, from either side, although there are truly numerous photographs, of the child's baptism, Plaintiff's baptism, the parties' "ceremony," and the celebratory luncheon afterwards. Defendant alleges that there was simply not enough time for a Coptic wedding. For this Court to invalidate what it is finding to have occurred, on the basis of conflicting testimony about timing, is not logical or sufficient.
The luncheon itself is the final important piece of the "marriage" puzzle. Only the first of the three events that day was previously planned (the child's baptism), and the luncheon was also previously planned, with all of the guests invited, including Bishop A.B. and Father H.H.. After the three ceremonies, it is undisputed that the parties and their guests did go to the celebratory luncheon, and that there were numerous congratulatory toasts. L.G. testified very credibly that he, at Defendant's request, gave one such celebratory toast, congratulating the couple on both their child's baptism and their wedding. Mr. L.G. was unequivocal in his recollection that it was the Defendant who asked him to speak, and that Mr. L.G. very clearly gave a congratulatory speech on their wedding. He even recalled how many other guests gently teased or congratulated the couple that they got a "three for one," meaning three ceremonies for the price of one baptism. L.G. testified that he had at first been friends with Defendant, and was also his lawyer and good friend, then also became friends with Plaintiff, although at the time of the wedding, was much closer to Defendant, and that his current rift with Defendant is in large part due to Defendant's disavowment of that day as a wedding, in part specifically because, as L.G. testified, it was Defendant who asked him to give the wedding toast, and is now looking him in the face and saying it never happened. 
Here, as in T.I. v. R.I., supra, the parties participated in a religious solemnized ceremony, one that so looked like a wedding that the church's Father H.H. prepared the marriage certificate, and until one day before his testimony here, never thought anything other than that the parties were married that day in that ceremony. Plaintiff believed she was married — that is undisputed. Defendant now states that he did not think he was married, but his actions during the years [*14]immediately after the ceremony paint a clear and undisputed picture that he could have only thought that he was married and not otherwise. The parties left that ceremony, much as Father H.H. did, with "a justified expectation" that they were married. See Farraj, 72 AD3d at 1084. In reaching its determination, the Court must, and does, apply neutral principles of law, and does not reach into religious details of a ceremony within the Coptic Orthodox Church. The court finds, by a preponderance of the evidence, that Plaintiff has more than carried her burden that there was indeed a religious marriage ceremony that day, and further, that both parties so understood, as well, as did Father H.H. (and at least some of their wedding's witnesses).
As stated supra, the Court does not pass on whether this church currently recognizes the parties' religious marriage but rather, whether their religious ceremony is sufficient to have created a civil marriage, such that the parties are now considered married civilly by New York State. For all of the reasons stated supra, the Court so finds.
The parties, with counsel, shall appear for a Preliminary Conference in herein matrimonial action on [date redacted], in Part 44, in person. Parties shall file the proposed Preliminary Conference order at least one week prior to that appearance. Each side shall also file an executed Statement of Net Worth one week prior to the appearance.
The Court also reminds all of the Uniform Civil Rules for the Supreme Court and the County Court 202.23, Consultation prior to Preliminary and Compliance Conference:
Counsel for all parties shall consult prior to a preliminary or compliance conference about (i) resolution of the case, in whole or in part: (ii) discovery, including discovery of electronically stored information, and any other issues to be discussed at the conference. (iii) the use of alternate dispute resolution to resolve all or some issues in the litigation: and (iv) any voluntary and informal exchange of information that the parties agree would help aid early settlement of the case. Counsel shall make a good faith effort to reach agreement on these matters in advance of the conference.

Counsel fees
By Notice of Cross-motion on herein sequence 002, Plaintiff seeks both a finding that the parties' marriage is valid, and sanctions, seeking an order as follows:
a) Pursuant to CPLR § 3001, declaring the Parties' [] marriage valid;
b) Pursuant to New York State Court Rules ("NY Ct. Rules") § 130-1.1(c), finding Defendant's Order to Show Cause [] frivolous;
c) Pursuant to 22 NYCRR 130-1.1(b), sanctioning Defendant and/or his Counsel for filing a frivolous motion;
d) Pursuant to 22 NYCRR 130-1.1(a), assessing costs and sanctions against Defendant and his Counsel as and for actual expenses reasonably incurred, as well as reasonable attorneys' fees resulting from such frivolous conduct; and
e) For such other and further relief as to this Court deems just and proper.
[NYSCEF doc. 102, Notice of Cross Motion, seq. 002]
Plaintiff seeks sanctions pursuant to NYCRR § 130-1.1, in responding to defendant's allegedly frivolous order to show cause and pursuit of litigation in this court. Defendant also seeks sanctions on his motion in chief, against Plaintiff for filing herein matrimonial action.
22 N.Y.C.R.R. 130-1.1 provides:
"(a) The court, in its discretion, may award to any party or attorney ... costs in the form of [*15]reimbursement for actual expenses reasonably incurred and reasonable attorney's fees, resulting from frivolous conduct .... In addition to or in lieu of awarding costs, the court, in its discretion may impose financial sanctions upon any party or attorney in a civil action or proceeding who engages in frivolous conduct ....
(c) ... conduct is frivolous if:
(1) it is completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law;
(2) it is undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another; or
(3) it asserts material factual statements that are false."
In determining whether conduct is frivolous, the court shall consider " 'the circumstances under which the conduct took place, including the time available for investigating the legal or factual basis of the conduct, and whether or not the conduct was continued when its lack of legal or factual basis was apparent, should have been apparent, or was brought to the attention of counsel or the party.' " Tavella v. Tavella, 25 AD3d 523, 524-525 [1st Dept 2006] (citation omitted)). Sanctions are appropriate only when a party or an attorney has abused the judicial process or wasted judicial resources by engaging in wholly frivolous litigation. The court must find, not only that the complaint or motion was without merit in law, but also that it could not be "'supported by a reasonable argument for an extension, modification, or reversal of existing law.'" Kremen v. Benedict P. Morelli & Assoc., P.C., 80 AD3d 521, 523 [1st Dept 2011], quoting 22 NYCRR § 130-1.1 (c) (1)).
Here, the issues required extensive motion practice, including to compel each of Bishop A.B. and then Father H.H. to testify, and the issues presented cannot be said to be frivolous. The decision as to whether to award sanctions remains within the sound discretion of the court. Wagner v. Goldberg, 293 AD2d 527 [2d Dept 2002]. The court, therefore, will not impose sanctions against defendant, and those branches of the cross motion relating to sanctions for the filing of the motion are denied. The court also cannot and does not impose sanctions against plaintiff, as defendant was not successful on his motion in chief.
The Court also notes that on herein motion, Plaintiff did not seek interim counsel fees pursuant to Domestic Relations Law § 237(a) (understandably so, as the issue of whether the parties were or were not married was the subject of the motion). Now that the Court has ruled that the parties are married, the Court assumes that Plaintiff may seek pendente lite counsel fees pursuant to Domestic Relations Law § 237(a), which, if appropriately supported and if granted, would be subject to reallocation at settlement or trial. The Court does note, that at least on the basis of the current motion and hearing, reallocation of some of Wife's fees may be highly appropriate, although, of course, taking into "consideration the financial circumstances of the parties, the merits of the parties' positions, the nature and extent of the services rendered, the complexity of the issues involved, and the reasonableness of counsel's performance and fees under the circumstances." Deborah R. v Dean E.H., 183 AD3d 500, 501 [1st Dept 2020].
Accordingly, upon the aforementioned papers, prior proceedings in this matter, and for the reasons stated herein, IT IS ORDERED, that motion sequence 002, filed by Defendant is decided as follows: 
1. Branches (a) and (g) of the motion is denied;
2. Branches (b), (c), and (e) of the motion are denied without prejudice to a renewal, if [*16]otherwise appropriate, after the Preliminary Conference;
3. Branches (d) and (f) of the motion are denied as moot.
Upon the aforementioned papers, prior proceedings in this matter, and for the reasons stated herein, IT IS FURTHER ORDERED, that cross-motion on sequence 002, is decided as follows:
1. Branch (a) is decided as stated supra on the motion in chief.
2. Branches (b) — (d) are denied without prejudice to reallocation of counsel fees at settlement or trial, and/or application for pendente lite counsel fees, if otherwise appropriate.
This original Decision and Order is filed by the Court on NYSCEF, which shall constitute filing and entry. Plaintiff is hereby directed to file a Notice of Entry of herein Decision and Order within five days.
DATE July 9, 2024